Keating, J.
Upon the sole direct testimony of one Anthony Getch, the appellants, Anthony Regina (also known as “Fat Tony ”) and John J. Battista (also known as “ Moose ”), stand convicted of murder in the first degree and assault in the first degree.
The defense at the trial (Suffolk County Court; MoInerney, J.) was alibi. Each appellant alleged and attempted to prove through various witnesses that he was 60 or 65 miles away from the place of the murder at the time of the murder. The jury disbelieved them.
On this appeal, the appellants urge that the testimony of Anthony Getch was unbelievable as a matter of law and that certain prejudicial errors were committed at the trial.
At about 1:30 in the afternoon of August 9, 1963; Anthony Getch, Louis Mariani, the deceased, and Louise Mangiamelli, the sister-in-law of Mariani, were driving along a highway near Port Jefferson in Suffolk County when another automobile *69 carrying three persons pulled alongside on the right and began firing pistol shots into the car driven by Mariani.
Mariani was killed. Louise Mangiamelli, who was sitting in the center of the rear seat, testified that she ducked down to the floor and saw nothing. Anthony Getch, who was sitting in the front passenger’s seat, testified that, in the few seconds before he ducked under the dashboard, he observed the car alongside, saw the appellant Regina driving, pointing, and firing a pistol, and saw two other persons in the car, one of whom he recognized as the appellant Battista and the other of whom remains unidentified.
Getch’s testimony is crucial and the contention that it is incredible and unbelievable as a matter of law demands that it receive special scrutiny.
At the time of this murder, Getch was on parole after a felony conviction for assault and robbery. At 27 years of age, he had spent the greater part of the last 12 years of his life in jail for one crime or another. From the sentencing minutes it appears quite clearly that the victim, Mariani, was a gangster in one organization ‘ ‘ known as the Gallo mob. ’ ’ The appellant, Regina, was a member of the rival Frofaci group. Getch, it may be inferred, was also involved with the Gallo mob and, indeed, the prosecution as well as the appellants assume that this killing was merely one in a series of killings since about 1960 growing out of a feud between the two rival organizations. There is, however, no testimony establishing a relationship between Battista and Regina or between Battista and either gang.
Getch testified that they were driving along when a big black car pulled alongside of them. The radio in the other car was very loud. Getch turned and saw Regina driving. He also saw Battista sitting in the back seat behind Regina and another man whom he never saw before or after was in the front seat next to Regina. Regina raised a pistol in his right hand and started firing in Getch’s direction. As he did so, Getch ducked toward the dashboard. The entire elapsed period between the time that Getch first observed Regina and Battista and the time that the first shots were fired was 4 or 5 seconds. When he raised his head again, the black Chrysler was gone.
According to the appellants, it is inconceivable that during the 4 or 5-second period Getch could have seen all of the fol *70 lowing: (1) Regina, driving with one hand and pointing the pistol with the other, looking at Getch and at the road ahead, while Getch, throughout, was looking at Regina, at Regina’s gun and at everyone else in this auto; (2) that another man was next to Regina whom Getch did not recognize but that he kept his eyes on this person too at all times; (3) that Battista was sitting in the back seat and that he, Getch, observed him throughout; (4) that, during a part of this time, Regina’s vehicle was within 2 feet of the vehicle in which he was riding, and (5) that Getch waited until 2 shots were fired before ducking down.
Extensive comment upon this aspect of the case is unnecessary. Essentially, as is the situation with so much of this case, nothing more than an issue of credibility was created. There is nothing inherently inconceivable or even unusual about the above testimony by Getch. Common experience dictates that a person can observe an entire scene or more than one person at a time, especially where the grouping is within narrow confines, such as an automobile.
We come now to the alleged inconsistencies in Getch’s story. The appellants point to a number of occasions, pretrial and before the Grand Jury, on which Getch stated that he ducked down as soon as he saw a pistol and, thus, presumably before the shooting started. Getch, however, also testified that he started ducking after 2 shots were fired and that he saw Battista only when he, Getch, was going down.
Actually, in view of the very short time interval involved, the conflict seems more imagined than real. At no time did Getch state that he ducked before any shots were fired or before he was able to see the car’s occupants. Those are all inferences drawn by the appellants based on Getch’s testimony that he went down when he saw them and when he saw Regina pointing the pistol. When confronted with the apparent contradictions, as the appellants sought to draw the narrow (though crucially significant) distinctions for the first time, Getch said: “ Well, they didn’t ask me the way you asked me. They asked me the question different.” But Getch consistently stated, when confronted with the question directly, that shots were fired before he ducked and that he saw the appellants both before and as he was going down. ,
*71 There is one other apparent but unexplained contradiction in Getch’s testimony. He was held immediately after the killing as a parole violator and as a material witness, When first questioned, he said only that the other car was a 1951 or 1952 tan colored Oldsmobile, but he denied any other knowledge of the killing. It was only after Getch was told that he would be returned to Elmira Prison as a parole violator that he asked to speak with the District Attorney and agreed to give him a statement. The only explanation for the contradiction as to the car’s color is his statement that, after the killing, he 11 told her [Louise Mangiamelli] to say that she seen an Oldsmobile, and she says she would say it’s green and I would say it’s tan.”
Mrs. Mangiamelli only admits to having seen a green car in front of her after she got up from the floor of the rear seat. She saw nothing else.
The alibi testimony was unimpeached, save for the fact that it was also obviously disbelieved by the jury. It drew for the jury a sharp question of fact and it may be summarized briefly.
Appellant Battista offered the testimony of 8 witnesses, who stated, in substance, that on August 9, 1963, at the time of the murder, Battista was at work on the pier of his employer in Brooklyn.
Frank Florio, the timekeeper at the pier, testified that he checked Battista in to work at 1:00 p.m. but it is unclear whether his testimony is based entirely on written records or at least in part on independent recollection.
Joseph De Pippo testified that Battista was on line in front of him at the pier when he checked in to work.
Anthony Giordano testified that he spoke to Battista for about 15 or 20 minutes at 1:00 p.m. about the killing of one Joe Batts and that a man by the name of Joe Barbella was present throughout the conversation.
Barbella confirmed his presence and his meeting with Battista that afternoon.
Jerry Aloi, a coemployee of Battista’s, also saw Battista at the pier at about 1:00 p.m.
John G. Foray, an employee of the Waterfront Commission, testified from records kept in the regular course of the commission’s business that Battista was recorded as having worked on the pier on. the day in question, but he also stated that the record *72 information was furnished by a hiring agent, an employee of Battista’s employer, and that he had no knowledge of the accuracy of the information.
Two additional employees also testified to Battista’s presence on the pier that day.
The alibi testimony on behalf of appellant Regina sought to establish that he was at his home in Commack, Long Island, during that entire day.
Carol De Serio, a friend of the Regina family, stated that she called and spoke to Regina at 12:18 p.m. on August 9, 1963. She invited him to ride into New York City with her, but he turned down the offer, explaining that it would take her out of her way. New York Telephone Company records confirm the placing of a call between the two residences at 12:18 p.m. for 4 minutes.
Regina’s wife testified that her husband was at home all day and that various telephone calls were placed and received between 12:00 m. and 1:00 p.m.
The amount of apparently uncontroverted alibi testimony in this case is impressive, especially when it is viewed against the sole contrary testimony of Getch, who allegedly was a rival gang member. On the other hand, it is well to keep in mind that if the killing was a premeditated gangland murder, as the prosecution urged, it is not inconceivable that the testimony of alibi and the telephone calls were also pre-planned. These issues were, upon the entire record, questions of fact for the jury, to be determined, not only from the words, but also from the demeanor, interest and motives of the witnesses. Clearly, we cannot agree with appellants that the testimony of Getch was incredible as a matter of law.
The proof against appellant Battista is not as strong as the proof against Regina. Nonetheless, it is adequate to sustain the conviction. This proof rests on circumstantial evidence from which inferences may be drawn, but the evidence appears to be direct, substantial and unequivocal.
In their brief appellants hedge between referring to 3 persons in the car or 4 persons in the car, and with good reason. Indeed, if the proof showed there were 4 persons in the Chrysler, a reversal as to Battista might be necessary, on the ground that only 3 pistols were fired within the 5-second period as indi *73 cated by testimony of ballistics experts regarding results of examination of the car.
Getch was initially asked ‘ ‘ how many men were in the car besides this fellow you know as Fat Tony [Regina] ? ’ ’ Getch answered ‘ ‘ Three ’ thus indicating that there were 4 in the car altogether. It is manifestly clear, however, that this answer was a mistake resulting from Getch’s having misunderstood the question. Immediately after giving the above answer, Getch mentioned that Battista was in the rear seat and that there was a third individual in the car. He consistently reiterated that there were only 3 men in the car and, when confronted with the prior testimony, he stated that that answer was a mistake.
Getch also testified that during the 4 or 5-second period there were 1 ‘ Maybe fifteen or fourteen” shots fired, not less than 10 and perhaps as many as 20. A ballistics expert testified that there were 9 bullet holes in the Mariani vehicle though, as the appellants point out, there could have been as few as 8 shots fired since one hole in the vehicle was an exit hole. Of course, it is entirely possible that a number of shots missed the vehicle altogether and, since the windows in the Mariani vehicle were open, it is also possible (if not probable) that the bullet which struck Mariani in the head and killed bi-m is not included in the count of 8 or 9 shots into the vehicle itself. There were, at any rate, an absolute minimum of 8 shots and an approximate maximum of 20 shots fired from a vehicle carrying 3 persons within a time period at no time estimated to be more than 5 seconds.
When this evidence is coupled with the expert testimony which, if believed, established that during the 5-second period 3 separate weapons, none of which were automatic, were fired, I believe that any deficiency which would otherwise result from the failure of anyone to actually see Battista with a weapon is satisfactorily overcome. This circumstantial evidence, if accepted by the jury, -as it quite obviously was, points unequivocally to the direct involvement and participation of all 3 persons in the car driven by Regina and it excludes to a moral certainty, though perhaps not to an absolute or metaphysical certainty, every other hypothesis consistent with innocence. It meets, in other words, the required test for certainty of circumstantial *74 evidence laid down in such cases as People v. Harris (306 N. Y. 345) and People v. Eckert (2 N Y 2d 126). And, of course, this chain of circumstantial evidence goes only to the question of Battista’s actual participation in the killing. There is direct evidence of the eyewitness Geteh which places Battista at the scene of the murder.
With the proof as it is here, and especially in the light of the People’s theory of a premeditated killing, this court’s statement in People v. Harris (136 N. Y. 423, 429) seems particularly appropriate; “The necessity of a resort to circumstantial evidence in criminal cases is apparent in the nature of things. For a criminal act is sought to be performed in secrecy, and an intending wrongdoer usually chooses his time and an occasion when most favorable to concealment, and sedulously schemes to render detection impossible. All that we should require of circumstantial evidence is that there should be positive proof of the facts from which the inference of guilt is to be drawn and that that inference is the only one which can reasonably be drawn from those facts.”
We are urged to hold that the following sequence of events constituted prejudicial error. After Louise Mangiamelli testified to having no knowledge of who fired the shots, the prosecution recalled Getch to the witness stand and elicited from him that immediately after the shooting Mrs. Mangiamelli stated “ That fat bastard. Shooting with me in the car.” The testimony was objected to on the ground that it constituted improper rebuttal.
The appellants contend that this evidence was inadmissible to corroborate the testimony of Getch implicating the appellants and that reversible error was committed by the court’s failure then, or during the charge to the jury, to limit the use of the testimony to the impeachment of Mrs. Mangiamelli only.
No request to so charge the jury was ever made but, aside from that obvious defect, we are convinced that on this voluminous record the error could not have been prejudicial.
The only additional reference to this statement came during the court’s summation of the evidence where he stated “ That she [Mrs. Mangiamelli] did not say to Getch, ‘ That bastard Fat Tony is shooting at me.’ ” The court does not refer to it in *75 summarizing Getch’s testimony; both defense attorneys urge that there is no corroboration of Getch at all in their summations without referring once to this testimony and, the prosecutor, who urged throughout his summation that internal corroboration of surrounding circumstances did exist, never once mentioned this statement by Mrs. Mangiamelli as corroboration, or otherwise.
Thus, although it is clear that the evidence was admissible only to impeach and not as affirmative evidence of guilt (People v. Freeman, 9 N Y 2d 600, 605; People v. Ferraro, 293 N. Y. 51, 56-57; Richardson, Evidence [9th ed.], § 513), we do not think there is any basis for believing that the error was prejudicial or that it warrants reversal.
We would only add, in addition to what has already been noted on this point, that the objection made on erroneous grounds at the trial and overruled may only be considered on appeal as to the ground specified (Richardson, Evidence, supra, § 543) since it was properly admissible if limited to use as impeaching testimony. And, of course, it is still necessary that an exception be taken to the court’s charge or failure to charge (Code Grim. Pro., § 420-a).
Another question in the case arises from the court’s refusal, upon request, to direct that prior statements given by defense witnesses to the prosecution be turned over to defense counsel. The request falls squarely within the rule stated in People v. Malinshy (15 N Y 2d 86, 90) though it occurs in a somewhat different factual setting. In Malinshy, we said: “defense counsel must be permitted to examine a witness’ prior statement, whether or not it differs from his testimony on the stand, and to decide for themselves the use to be made of it on cross-examination, provided only that the statement ‘ relates to the subject matter of the witness’ testimony and contains nothing that must be kept confidential ’.”
Both Joseph Barbella and Joseph De Pippo testified as alibi witnesses to Battista’s presence at work at the- time of the killing. During the People’s cross-examination of Barbella, the District Attorney asked if Barbella had previously given the prosecution a signed statement. Barbella answered affirmatively and the statement was thereupon marked for identifica *76 tion. Cross-examination continued, and, at its conclusion, defense counsel asked to see the statement. His.request was refused on the ground that it was inadmissible.
Substantially the same circumstances occurred when De Pippo was cross-examined.
The question, it seems to us, is whether the same “ right sense of justice ” which prompted our mandate in Malinsky (supra) is applicable here. The answer, we think, depends upon the use to which defense' counsel could have put the statement, whatever it contained.
In Malinsky, of course, the prior notes made by the People’s witness could have been used by defense counsel to impeach, to contradict, or to show a subsequent fabrication on the part of such witness. (See, also, People v. Rosario, 9 N Y 2d 286.) In the present case, we perceive no ground whatever upon which defense counsel could have employed the statement.
It could not have been used to impeach the appellants’ own witnesses. Indeed, no conceivable reason exists why counsel should wish to do so. Upon cross-examination by the prosecution, these witnesses were in no way impeached, nor indeed was there any claim, expressly or by implication, that their tale was a fabrication of recent origin. And even if it was, or if such was the claim, as the appellants admit, they would be unable to show that the statements were taken before a motive to fabricate existed.
No basis that we are aware of thus existed for the use of the statements by defense counsel in any case. All of the grounds upon which such a statement might be used, whether or not it varied from the witness’ testimony (see People v. Rosario, supra, p. 289), are inapplicable to a situation like the present one.
The appellants also contend that the trial court improperly precluded defense counsel from determining whether Getch had been given special consideration by the parole board in return for his testimony. Getch consistently denied receiving special treatment. There is no merit to this point. Getch’s parole officer testified at length. Getch had been convicted of robbery in the third degree in July, 1959 and was sentenced to a 5-year reformatory sentence at Elmira. He was paroled in April, 1961, and was charged as a parole violator as of August 8, 1963, the day prior to the murder, for consorting with an *77 undesirable character. He was released in November, 1963, with credit for parole time served between his original release in April, 1961 and his declared delinquency in August, 1963.
It was the appellants’ contention that the parole board, if it had seen fit, could have refused to give Getch credit for the time he was on parole and that the failure to do so constituted part of a deal or special consideration. The question, though really an issue of law, was explored through the testimony of the parole officer and he consistently stated that he knew of no case in which the parole board had pre-dated a delinquency and that it did not have the authority to do so. Delinquency, according to his testimony, could only begin to run from the date on which delinquency is actually committed and declared, and there is no authority for vitiating credit for prior good time served while on parole.
This issue was exhaustively gone into on the trial, notwithstanding the court’s recognition that the issue was really one of law and the testimony given fully corroborated the pertinent provision of the Correction Law (§ 218; see People ex rel. Dote v. Martin, 294 N. Y. 330). The court gave defense counsel full leeway to explore this issue and no error was committed in this respect.
The final point urged relates to the testimony of one Detective Lo Destro who, on direct examination for the People, testified that, on the night of the murder, at 7:30 p.m., he saw the appellant Regina riding as a passenger in an automobile. This testimony followed testimony by Regina’s wife to the effect that Regina was home all that day and evening. On cross-examination, defense counsel asked if the detective had made any notes of this occurrence ‘ ‘ that night ’ ’, to which Lo Destro answered “ No.” Thereafter, on redirect, Lo Destro was asked if he had ever made any notes of the occurrence and he answered that he had in fact done so three days later on August 12. The answer was given over objection and the matter was pursued no further.
Appellants claim that the testimony was improperly allowed to buttress Lo Destro’s prior testimony, notwithstanding the defense’s failure to suggest that it was a recent fabrication.
The People contend that the defense, on cross-examination, attempted to imply that Lo Postro’s testimony was a recent *78 fabrication. We do not read the relevant portion of the record as the People do. The defense did no more than attempt to show that it was too dark for Lo Destro to have seen what he claims to have seen. We note, incidentally, that in one respect Lo Destro’s testimony was patently absurd. Upon repeated questioning, he persisted in asserting that at between 35 and 40 miles per hour, on a clear road, it took his car and the car in which Regina was a passenger about 10 minutes to travel half a mile.
Be that as it may, however, the prosecution’s question on redirect examination was properly within the scope of matters gone into on cross-examination and did no more than to explain, clarify and fully elicit a question only partially examined by the defense. It was entirely proper (People v. Buchanan, 145 N. Y. 1, 23, 24; Richardson, Evidence [9th ed.], § 531).
The appellants were afforded a full and fair trial. Only the existence of an alibi was really in issue and, when all is said and done, this boiled down to a pure question of fact for the jury.
The judgments of conviction should be affirmed.
Chief Judge Desmond and Judges Fuld, Van Voorhis, Burke, Scileppi and Bergan concur.
Judgments affirmed.