STATE of Iowa, Appellee,

v.

Jerry Leroy HANSEN, Appellant.

No. 56473.

Supreme Court of Iowa.

Jan. 22, 1975.

· Raymond E. Pogge, Council Bluffs, for appellant.

Richard C. Turner, Atty. Gen., Thomas D. McGrane, Asst. Atty. Gen., and Lyle Rodenburg, County Atty., for appellee.

Heard before MOORE, C. J., and RAWLINGS, LeGRAND, REES and HARRIS, JJ.

LeGRAND, Justice.

Violet Welch, a 59-year-old woman, was found dead in her home in Council Bluffs on October 21, 1972. Defendant was charged with willfully, deliberately and premeditatively murdering her with malice aforethought in violation of § 690.2, The Code, 1971. After a change of venue had moved the trial to Cass County, a jury found defendant guilty of first degree murder, and he was subsequently sentenced to serve a term of life imprisonment in the penitentiary. He appeals from that judgment on numerous grounds. We hold defendant should have a new trial because of reversible error in the trial court's instruction on reasonable doubt.

However, we must also rule on most of defendant's other complaints since they are likely to recur when the case is tried again.

The appeal raises the following issues: (1) error in overruling motion for directed verdict; (2) error in denying motion for a mistrial because of misconduct on the part of the county attorney; (3) error in the admission of certain evidence, including inculpatory statements of the defendant and incriminating exhibits; (4) error in rejecting defendant's testimony concerning the identity of the person he claims committed a 1961 murder for which defendant was tried and acquitted on the ground of insanity; (5) error in the admission of Dr. Loeffelholz' testimony; (6) error in admitting rebuttal testimony; and (7) error in the instruction on reasonable doubt. We recite the important facts as they become material in our discussion of the issues.

We do not consider these matters in the order listed, and we deal first with (7) of the listed issues because it is the ground upon which we reverse and remand for a new trial.

I. The trial court's instruction on reasonable doubt was the one generally used prior to our decision in State v. McGranahan, 206 N.W.2d 88, 91 (Iowa 1973). It also had the approval of the Iowa State Bar Association's Committee on Uniform Instructions. We set out the pertinent portion of the instruction as given in the case now before us:

"The burden is on the State to prove the defendant guilty beyond a reasonable doubt.

"A 'reasonable doubt' is such a doubt as fairly and naturally arises in your mind and by reason of which you cannot say that you have a full and abiding conviction of the guilt of the defendant; and if, after considering all of the circumstances as disclosed by the evidence, you find your mind wavering or vascillating, then you have a reasonable doubt, and the defendant is entitled to the benefit of such doubt and you must acquit him. A reasonable doubt may arise from the evidence in the case or *it may arise from a lack or failure of evidence*, and it must be such a doubt as would cause a reasonable, prudent and considerate man to pause and hesitate before acting in the graver and more important affairs of life * * *" (Emphasis added.)

Defendant made good and timely objection to the instruction on the ground it placed a burden on defendant to produce evidence.

Although we had long been critical of the emphasized language (see State v. Stout, 247 Iowa 453, 74 N.W.2d 208 (1956)), it was not until the *McGranahan* case that we condemned the instruction in terms which clearly put the bench and bar on notice that it was doomed, even though there it was saved by other parts of the jury charge.

Shortly after *McGranahan*, we met the issue squarely in State v. Boyken, 217 N.W.2d 218, 219 (Iowa 1974), where we reversed because of an instruction virtually identical with the one now under review. The vice of the instruction, of course, is that it permits the jury to consider defendant's failure to produce evidence in deciding if there is reasonable doubt and places upon him the burden of producing evidence or risking the danger of having his failure to do so considered by the jury as overcoming any reasonable doubt which might otherwise exist.

In *Boyken* we held the reasonable doubt instruction must limit the jury's consideration of *lack* of evidence to lack or failure *on the part of the State*. Otherwise it is fatally defective because it impermissibly allows the jury to consider defendant's failure to introduce evidence in deciding if reasonable doubt exists.

The State concedes the case must be reversed unless *McGranahan* and *Boyken* are reconsidered and overruled. We adhere to the conclusions reached there, and, consequently, the case is reversed and remanded for a new trial.

In fairness to the trial court, we point out the trial of this case started March 27, 1973, the day before our decision in *McGranahan* and sometime prior to our decision in *Boyken*. The trial court did not have the benefit of either opinion when the challenged instruction was given and the form in which it was submitted had then been in approved use for some time.

II. The issue raised concerning Dr. Loeffelholz's testimony presents troublesome questions, principally because of the state of the record and the inescapable fact there is to be a new trial. On the basis of the objections made at trial, much of Dr. Loeffelholz's testimony was clearly admissible, although other parts should have been excluded. However, on retrial, his testimony should not be allowed at all.

The matter arises in this way. Defendant made application for a mental examination to determine his competency to stand trial. His application was granted, and he was sent to the Iowa Medical Facility at Oakdale for that express purpose. There he was under the constant supervision of Dr. Loeffelholz for a period of three weeks.

From the nature of the application and the order entered thereon, it is clear defendant submitted to the examination to determine if there were grounds for a Chapter 783 competency proceeding.

This chapter provides, in substance, that if reasonable doubt as to the defendant's competency to stand trial appears, further proceedings shall be suspended until a separate determination on that matter is made. §§ 783.1, 783.2, The Code.

This course was not followed, perhaps because the report from Dr. Loeffelholz satisfied defendant and his counsel it would have been futile. In any event, no such issue was considered or decided before or during defendant's trial. The defense asserted at trial related only to defendant's sanity at the time of the offense, not his competency to stand trial.

■ Under this state of the record, we hold Dr. Loeffelholz's opinion that defendant was competent to stand trial, if relevant, was admissible against the privilege objection because the privilege had been waived. See State v. Mayhew, 170 N.W.2d 608, 615 (Iowa 1969); 3 Jones on Evidence, (4th Ed., Gard, 1972), § 20:26, page 814.

■ However, defendant's waiver of the privilege extended only that far. It was just as limited as the purpose for which he submitted to the examination in the first place. It did not operate as a general waiver of all privilege nor did it open up the subject of defendant's past medical history without restriction. Cf. Barnard v. Cedar Rapids City Cab Co., 257 Iowa 734, 750, 133 N.W.2d 884, 895 (1965). Since the issue of defendant's competency to stand trial did not arise, Dr. Loeffelholz's testimony on that point became irrelevant. We have not overlooked the fact defendant's past medical records were in evidence without objection; but this does not render Dr. Loeffelholz's opinion of the matters shown by those reports relevant.

We recognize the objections at trial did not rest on this ground, and we would not, of course, reverse on a point not urged below. However, we state our views now in order to avoid possible error on retrial.

Because of what we have already said, we need not reach the additional question as to whether part of the doctor's testimony was inadmissible because it was based on the opinions of others. However, see Hedges v. Conder, 166 N.W.2d 844, 856, 857 (Iowa 1969); Dougherty v. Boyken, 261 Iowa 602, 611, 155 N.W.2d 488, 495 (1968); Ipsen v. Reuss, 239 Iowa 1376, 1388, 35 N.W.2d 82, 91 (1948).

III. As already mentioned, several other matters which form the basis of appeal are likely to come up again, and we should review them for the benefit of the court and counsel on retrial.

IV. Defendant says he was entitled to a directed verdict because there was insufficient evidence of his guilt to submit the

case to the jury. His motion made at the end of the State's case was not renewed at the end of all the testimony.

It is true, as the State argues, error may not be predicated on denial of a motion for directed verdict made at the close of the State's case when there is additional evidence offered thereafter. State v. Allison, 206 N.W.2d 893, 894 (Iowa 1973); State v. Niccum, 190 N.W.2d 815, 823 (Iowa 1971). However, we settle the question because of the necessity for retrial. In appraising the evidence for this purpose, we view it in its light most favorable to the State. State v. Pardock, 215 N.W.2d 344, 346 (Iowa 1974); State v. Schurman, 205 N.W.2d 732, 733 (Iowa 1973).

The transcript discloses the jury could have found defendant was in the decedent's home near the time of her death; that he engaged in an altercation with her; that he struck her several times about the head and face with a hammer; that the stab wound from which she died was inflicted by a knife to which defendant had access and which was later found in his possession under incriminating and suspicious circumstances; that his blood-stained clothing, which he says became soiled in a fight that night, actually resulted from his assault on decedent; and that his hasty action in washing his shoes and clothing early in the morning following decedent's death to remove these blood stains was more consistent with the State's version than with his explanation.

We hold the evidence was sufficient to permit the jury to pass upon his guilt or innocence. Defendant was not entitled to a directed verdict.

V. We next consider the alleged misconduct on the part of the county attorney which defendant says was so serious it denied him a fair trial. His claim is based upon the following incidents: (1) repeated and persistent questioning of Dr. Paul Loeffelholz as to the findings of another doctor in 1961; (2) conduct of the prosecuting attorney in cross-examination of defendant's mother which included "shouting at her in a loud voice and suggesting that she had concocted a story at her son's trial in 1961 concerning his mental condition;" (3) misconduct in the cross-examination of Anseline Kellar; and (4) prejudicial tactics of the county attorney in "standing before a trembling witness and shouting at her and making improper motions to indicate she was not telling the truth."

Some of these complaints, like the prosecutor's tone of voice and his gesturing, cannot be reviewed as there is no record to support them. State v. Means, 211 N.W.2d 283, 288 (Iowa 1973); State v. Kendrick, 173 N.W.2d 560, 563 (Iowa 1970); State v. La-Mar, 260 Iowa 957, 966, 151 N.W.2d 496, 501 (Iowa 1967).

We have examined the transcript with regard to the other allegations of misconduct and agree with the trial court that nothing the county attorney did or said deprived defendant of a fair trial. Not all misconduct entitles defendant to a new trial. It must reach such proportions that his first trial became an unfair one. State v. Johnson, 222 N.W.2d 483, 486–488 (Iowa 1974); State v. Levy, 160 N.W.2d 460, 467 (Iowa 1968); State v. Tolson, 248 Iowa 733, 734, 82 N.W.2d 105, 106 (1957).

We have also held trial courts are vested with considerable discretion in granting or refusing new trials for misconduct of counsel. State v. Lyons, 210 N.W.2d 543, 548 (Iowa 1973); State v. Still, 208 N.W.2d 887, 892 (Iowa 1973); State v. Vickroy, 205 N.W.2d 748, 749, 750 (Iowa 1973); State v. Wheelock, 218 Iowa 178, 182, 254 N.W. 313, 315, 316 (1934).

In ruling on the motion for mistrial the trial court noted that some of the cross-examination was "irrelevant, immaterial, * * * had no bearing on the character of the witness [Anseline Kellar] on the stand." We agree and certainly such overreaching should not be repeated.

We believe the trial court was careful to keep tight control over a trial which was highly emotional at times. While it may be argued the county attorney several times went beyond the limits of proper cross-examination, there was nothing in such conduct which deprived defendant of a fair trial.

VI. Defendant also complains because the trial court admitted into evidence over his objection a knife offered by the State as an exhibit. Here are the factual circumstances surrounding the identification and admission of this weapon.

Although the victim of this crime was severely beaten about the head and body, the cause of death was given as a stab wound. On the day following the murder, defendant's stepfather delivered a hunting knife owned by him to the police. He testified the knife was ordinarily kept in a kitchen cabinet. The day before the murder, defendant had been using it to clean fish. After the murder, defendant's stepfather found it secreted in an old trunk in the basement where defendant had sleeping quarters. The stepfather testified the knife had never been kept where he found it.

It was agreed the stab wound from which the decedent died could have been made by this knife. Laboratory examination disclosed blood on the instrument but not in sufficient amount to identify it as being either defendant's type or the victim's type. Defendant testified his mother had asked him to put the knife in the trunk because she had cut herself with it. She did not confirm this story.

■ Defendant argues there was no showing the knife was used in the killing and nothing to show its relevancy to the crime. We agree it was not shown this knife inflicted the wound from which decedent died, but such proof is not necessary. It need only be shown there is reasonable likelihood it was so used. State v. Galvan, 181 N.W.2d 147, 151 (Iowa 1970); State v. Williams, 245 Iowa 494, 505, 62 N.W.2d 742, 748 (1954); State v. Johnson, 162 N.W.2d 453, 456 (Iowa 1968); State v. Browman, 191 Iowa 608, 627, 182 N.W. 823, 831 (1921).

■ Here defendant was in possession of the knife. It could have inflicted the fatal wound. Defendant was with the victim during the time her death may have occurred. And the knife was found under circumstances strongly suggesting defendant had hidden it to divert suspicion from himself.

We hold it was properly admitted.

VII. We deal next with defendant's claim it was error for the court to overrule his motion to suppress certain inculpatory statements (Exhibits 37 and 38) made by him to police officers. Significantly, defendant does not claim the statement was given in violation of the Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). Rather, he claims the statement "was taken while defendant was at the police station and before he was represented by counsel, and at a time when he was mentally disturbed, under the influence of either a drug or alcohol, and in such a frame of mind and a condition of mind that he was unable to recognize the consequences of his act in signing said statement or to realize his legal rights."

A hearing was held on this motion prior to trial and the trial court ruled the statement was admissible, setting out detailed findings of fact in support of his decision.

The issue, of course, is whether defendant's statement was voluntary. As already indicated, the Miranda requirements were met on at least two occasions. Defendant also refused to see his mother and stated he did not want an attorney.

This brings us to the disputed statement given by defendant to Officers Capel and Mitchell on October 22, 1972, the day after the murder. The questioning took place at the police station. Defendant had been brought to the station earlier and had been detained there. The officers insisted he

was not under arrest and was free to leave at any time. However, we consider this to be custodial interrogation. There is nothing to show the questioning was unduly long or unfair. The evidence shows the defendant was allowed food, coffee, cigarettes, and medication. He was not subjected to any promises or threats nor is there any showing he was under the influence of either drugs or alcohol. There is evidence that he was in an emotional frame of mind and was "upset;" but this falls far short of demonstrating his statement was involuntary.

Defendant's strongest point in attacking this evidence is that he was confined in the city jail from approximately 3:00 P.M., October 21, until approximately 11:30 A.M., October 22, without a charge being filed against him and without being taken before a magistrate. He was then interrogated by Officers Capel and Mitchell and the statement was signed by defendant at approximately 1:37 P.M.

We quote from the trial court's findings as follows:

"The court finds that the defendant has had prior experience of being interrogated by police officers and being confined in jail and therefore this experience was not a new or frightening one for him. The court further finds that this defendant was not abused, intimidated, coerced or deceived in any respect. The court further finds that the defendant at the time, though somewhat upset and excited, was not mentally disturbed or under the influence of drugs or alcohol or in such a frame of mind and condition of mind that he was unable to recognize the consequences of his act in signing the waiver of the Miranda rights, and in signing the statements of both prepared by himself and prepared by the police officer.

"The court cannot find any evidence whatsoever that defendant at any time indicated in any manner that he desired to avail himself of any rights provided for

under the Miranda ruling. Neither can the court find any evidence whatsoever that the defendant was ever threatened, tricked or cajoled into executing the waiver or statements.

"From the foregoing findings of fact, the court concludes that the execution of the waiver of rights, the execution of the statement prepared by the police officer and the preparation and execution of the statement made by the defendant himself was done voluntarily and with full knowledge of his legal rights."

Our independent review of the record and the transcript leads us to the same general conclusion as that reached by the trial court.

Failure to take a defendant immediately before a magistrate as provided in § 758.1, The Code, does not of itself render a statement taken prior thereto inadmissible. State v. Milford, 186 N.W.2d 590, 592 (Iowa 1971) and citations. It appears that here as in the *Milford* case, there were various investigations to be made and completed before a charge could be filed. Defendant's detention was not for the purpose of inducing a confession from him and we hold that the delay was not an unreasonable one nor did it make his statement inadmissible.

In determining the voluntariness of a statement, whether it be a confession or merely an admission, each case must be determined largely on its own facts and the circumstances surrounding the interrogation which led up to the statement. State v. Moon, 183 N.W.2d 644, 646-649 (Iowa 1971); State v. Tharp, 258 Iowa 224, 231, 138 N.W.2d 78, 82 (1965); cf. State v. Clough, 259 Iowa 1351, 1355, 147 N W 2d 847, 851 (1967)

We hold the State established the statement was voluntarily given and the trial court properly admitted it. State v. Dodson, 195 N.W.2d 684, 686 (Iowa 1972); State v. Fetters, 202 N.W.2d 84, 88, 89 (Iowa 1972); State v. Olson, 260 Iowa 311,

318, 319, 149 N.W.2d 132, 136 (1967); State v. McClain, 256 Iowa 175, 187, 125 N.W.2d 764, 770 (1964).

VIII. Much of the trial record and the briefs of both sides concerns a criminal trial in 1961 in which defendant was acquitted by reason of insanity of having murdered a 74-year-old woman.

This first appeared through certain medical reports already referred to concerning defendant's mental condition at that time. These reports came in without objection.

In connection with this, defendant assigns as error the refusal of the trial court to permit him to testify as to who committed the 1961 murder. This is one problem which can and should be avoided upon retrial. Assuming defendant's mental condition in 1961 may have some bearing upon his mental condition at the time of the crime for which he must again stand trial, we nevertheless hold evidence concerning the 1961 murder trial and defendant's acquittal by reason of insanity should be avoided. His mental condition at that time, if relevant, may be shown without reference to the criminal trial. If earlier medical reports are to be admitted for this purpose, it should be done so that any reference to the trial of defendant for the previous murder is deleted.

That matter has no relevance in his trial for the murder of Violet Welch. Even if it should be argued otherwise, the probative value of such evidence would be so minimal compared to the possibility of serious prejudice to defendant that it should be excluded.

With the exclusion of that evidence, defendant's offer to identify the party who committed the 1961 murder would not again come up.

IX. The last issue raised by defendant challenges the rebuttal testimony of Richard A. Mueller and Dr. Douglas N. Johnson.

The trial court has considerable discretion in the admission of such evidence, which has been defined as "that which explains, repels, controverts, or disproves evidence produced by the other side." State v. Walker, 218 N.W.2d 915, 919 (Iowa 1974).

We have reviewed the transcript and hold, without extended discussion, there was no abuse of discretion in allowing this rebuttal evidence. Upon retrial, of course, the propriety of rebuttal evidence must be determined on the record then made.

X. For the reasons stated in Division I, the case is reversed and remanded for a new trial.

Reversed and remanded.