**STATE of Iowa, Appellee,**

v.

**Daniel Russell MUNRO, Appellant.**

**No. 63105.**

Supreme Court of Iowa.

Aug. 27, 1980.

Martha Shepard, Polk County-Des Moines Offender Advocate Office, for appellant.

Thomas J. Miller, Atty. Gen., Selwyn L. Dallyn, Asst. Atty. Gen., and Dan Johnston, Polk County Atty., for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, ALLBEE, and McGIVERIN, JJ.

UHLENHOPP, Justice.

This appeal involves the propriety of the trial court's refusal to grant motions to suppress evidence and to exclude evidence. The motions to suppress were presented both prior to and in the course of a multiple-murder trial.

We recite only sufficient facts for disposition of the issues raised in the appeal. The case arose out of the deaths of four Des Moines residents on the morning of February 19, 1978. That day the bodies of three teenage boys were found lying on the floor of a downtown business establishment which was in the process of being remodeled. The body of William Baldwin, a clerk at an adult bookstore about a block away, was found on the floor of his place of employment. All four were killed by gunshot wounds to the head. Money was missing from the cash register at the bookstore.

Defendant Daniel Russell Munro was a suspect. He was arrested in Little Rock, Arkansas, on April 28, 1978, pursuant to a warrant issued in the State of Alabama for unlawful flight to avoid confinement for a previous conviction. After interrogation in Arkansas by agents of both the Iowa and federal criminal investigation bureaus, Munro was transported to Iowa and formally charged with the February 19th homicides.

Prior to trial, Munro filed a motion to suppress evidence obtained as a result of an April 28th search of his living quarters in Little Rock and any statements made by him to BCI and FBI agents while he was in their custody. The district court overruled the motion, finding that Munro consented to the search of his premises and that he "knowingly, voluntarily and intelligently waived his constitutional rights as to any conversation between himself and the law enforcement officers."

After a change of venue to Linn County, trial commenced on January 8, 1979. At the close of the State's evidence, the trial court sustained Munro's motion for directed verdict as to the count based on Baldwin's death. On January 19, 1979, the jury found Munro guilty of the remaining three counts of first-degree murder. Munro filed a motion for new trial, which was denied. The trial court sentenced him to three terms of life imprisonment and appointed appellate counsel. Munro then appealed to this court.

Munro bases his appeal on three asserted errors by the trial court: (1) in finding that Munro consented to the April 28 search of his living quarters, (2) in holding that he knowingly, voluntarily, and intelligently waived his rights to remain silent and to the presence of counsel, and (3) in admitting evidence regarding alleged shoeprints found at the scene of the boys' bodies.

I. *Search of Munro's living quarters.* Munro contends that the April 28 search of his Little Rock apartment was illegal and that all fruits of the search should therefore have been suppressed. The State relies on Munro's oral and written consent.

Formerly we held that consent to an otherwise illegal search had to be proved by clear and convincing evidence. *State v. Freese*, 166 N.W.2d 785, 787 (Iowa 1969). As a result of intervening federal decisions, however, we adopted a preponderance of the evidence rule in *State v. Folkens*, 281 N.W.2d 1, 3 (Iowa 1979). We there stated:

> Despite the language of our earlier cases imposing the higher standard of proof, we hold that a preponderance of the evidence by the state is sufficient to estab-

lish exceptions, including consent, to the "per se unreasonable" status of a warrantless search.

Two FBI agents, Danny Sisco and Dale Kent, arrested Munro in Little Rock on April 28. They did so at approximately 12:00 P.M. at a Salvation Army transient lodge and transported him to the Little Rock FBI office. At the pretrial suppression hearing Sisco testified he told Munro "he didn't have to let us search his room if he didn't want to," but Munro nevertheless responded, "I don't care. I don't have anything to hide." Munro's counsel then proceeded to question Sisco:

Q. Did you ask him to sign anything in regard to searching his room? A. Yes.

Q. All right. Do you have a copy of that with you at this time? A. The form that we entitle The Consent to Search Form, and it is just an authorization.

. . . .

Q. Do you now whether or not this was signed by Mr. Munro prior to the time that his room or the area where he was living at the Salvation Army was searched? A. Yes, it was.

While Sisco obtained Munro's consent, Kent actually performed the search. At the pretrial suppression hearing Kent was asked, "At the time you made the search of 4/28/78 you didn't obtain consent from the defendant, did you, personally?" Kent responded, "No, I personally did not." During trial Kent was again questioned regarding the execution of the consent form:

Q. Now, once [Munro] was transported back to the FBI office I believe you have said that is where you took him, is that correct? A. Yes, sir.

Q. Once he was transported back there what was done at that time? A. He provided a form consent to search his room and gave to Agent Sisco, who gave to me, and I went down to search his room at the Salvation Army.

Q. So he did sign a consent form on that? A. Yes, sir, he did.

The foregoing uncontradicted testimony together with Munro's signed consent form abundantly establish that Munro voluntarily consented to the April 28 search of his apartment. We find no inconsistency between Kent's statement at the suppression hearing that he did not *personally* obtain a consent form from Munro and his trial testimony that he obtained Munro's consent form through Sisco. The district court did not err in rejecting Munro's challenge of the April 28 search.

II. *Interrogation of Munro.* Munro argues that the trial court erred in admitting evidence obtained through the State's interrogation of him on the ground that the State employed "psychological coercion" which caused "any statements made by him to have not been made knowingly, voluntarily or intelligently." The State responds that Munro received the *Miranda* warnings prior to each interrogation session and that prior to each session he knowingly, voluntarily, and intelligently waived his rights to remain silent and to counsel.

The test for determining the admissibility of confessions or inculpatory statements is voluntariness. *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057 (1961). This court determines the issue of whether officers have exercised coercion so as to render statements involuntary by examining the totality of the circumstances. We have explained this "totality of the circumstances" test in the following manner:

No one factor is determinative of the voluntariness of a confession which necessarily depends upon the totality of the circumstances of the individual case.

There is not talismanic definition of voluntariness. The "totality of the circumstances" encompasses the characteristics of the accused and the details of the interrogation process. The court determines the facts surrounding the inculpatory statement, assesses their psychological impact on defendant, and evaluates the legal significance of defendant's reactions.

Defendant's choice to confess must be essentially free and unconstrained with his will not overborne and his capacity for self-determination not critically impaired. *State v. Cullison,* 227 N.W.2d 121, 127 (Iowa 1975) (citations omitted).

The "facts surrounding the inculpatory statement" here are these. When the homicide investigation began to focus on Munro, Des Moines police obtained a medical file on him from the Alabama Board of Corrections. The file contained reports of psychological evaluations while Munro was incarcerated in Alabama for a prior offense. Des Moines police also contacted an Alabama psychiatrist, Dr. Brown, who examined Munro on a previous occasion, and Barry Hess, an Alabama attorney who defended Munro in a previous criminal prosecution. No waivers of doctor-patient or attorney-client privileges were obtained. Among the items of information derived from these sources were the facts that Munro is of above average intelligence (I.Q. of 130), is a "loner," has a close relationship with his mother, has an alcohol problem, has attempted suicide on at least one occasion, and has been diagnosed as paranoid schizophrenic. This information was relayed to a Des Moines psychiatrist, Dr. Taylor, for the purpose of developing a "psychological profile" of Munro. Dr. Taylor then suggested certain interrogation techniques to Des Moines police which he believed would be most effective in dealing with a person of Munro's psychological makeup. Included among his recommendations were treating Munro with respect, addressing him as Mr. Munro, avoiding too close contact with him, and breaking eye contact. Dr. Taylor also suggested that only one officer interrogate Munro at any given time, because someone with Munro's psychological profile would probably refuse to talk if more than one investigator tried to question him.

Agent Wood of the BCI was the first officer to interrogate Munro after his arrest. That interview occurred on April 28, 1978, the same day Munro was arrested in Arkansas. It took place in Pulaski County

Jail in Arkansas with only Wood and Munro present, although other officers listened to the interrogation through an intercom. Munro was informed of his rights and signed a waiver form. Wood testified he followed Dr. Taylor's advice and asked Munro about his mother. Munro made no incriminating statements during this interview and generally denied involvement in the Des Moines homicides.

Wood next interrogated Munro on the morning of April 29, 1978. He again informed Munro of his rights and Munro again signed a waiver form. A short time after this session began, Munro indicated "he probably should talk to an attorney." One of the officers listening to the interrogation over the intercom testified Munro "said that he didn't want to talk anymore with anyone and requested an attorney." The interview ended at that time. No steps were then taken however to procure counsel for Munro, and he was apparently not represented by counsel throughout the interrogation procedures at issue here.

On the morning of May 3, 1978, FBI Agent Sisco was ordered to go to the Pulaski County Jail to obtain photographs and fingerprints of Munro for FBI files. During this procedure, Munro was not given the *Miranda* warnings. Agent Sisco testified he asked Munro whether he had contacted his mother since his arrest, and further testified:

> I told him—I said Dan, if you want to talk about this. I said, if you didn't do it tell me where the gun is and the gun will show that you didn't do it. And I left him my name, address and telephone number and left.

That afternoon Munro called Sisco's office and left a message that he would like to see Sisco again. Sisco testified that the following occurred when he returned to the jail:

> Q. [Munro] himself initiated this conversation, did he not? A. Yes. Matter of fact, when I walked in the room the first thing he said to me, well, I just wanted to tell you where the gun is.

Q. That is before you advised him of his rights? A. That's true.

Sisco also testified:

> Q. At that time did you advise him of any *Miranda* warnings? A. I did.
>
> Q. And was there a written consent form? A. There was.
>
> Q. Was it executed by the defendant? A. It was.
>
> Q. At that time do you know whether or not the defendant had an attorney? A. No, I do not. He did not request an attorney, no.
>
> Q. At least to you he hadn't? A. No, he had not to me.
>
> Q. What did he tell you? A. He told me where the gun was located.

In return for telling Sisco the location of the gun, Munro obtained a promise from Sisco that the FBI would do the original examination of the gun. This was apparently to allay fear, later expressed by Munro, that Des Moines police would attempt to "frame" him. The gun was found as Munro had indicated at a pawnshop in Springfield, Illinois, and was introduced in evidence at trial. The metal inside the barrel had been scratched and cut away.

At the close of the interview on May 3, Sisco again told Munro that "if he felt like writing me a letter or calling me or anything feel free to do so."

. In a letter dated May 11, 1978, Munro asked Sisco to "let me know where I stand with the authorities from Iowa." By that time Munro had been transferred to Kilby State Prison in Montgomery, Alabama.

On June 5, 1978, Sisco went to Kilby Prison at the request of the United States District Attorney in Des Moines to ask Munro additional questions about the gun, which by this time was in the hands of Des Moines police. Munro was given the *Miranda* warnings and signed a waiver form. The interview that followed lasted approximately two hours. Sisco testified regarding that interrogation:

> Q. Okay. What was the gist of the conversation? A. We talked primarily about the gun and about what he had

done while he was in Des Moines with the gun and everything that happened. Well, basically he had told me what he had done on Sunday, February the 19th.

Q. And at all times he was proclaiming his innocence? A. Yes. Matter of fact, he told me—I told him that the gun had not checked out to my knowledge at the time, and he said that is good. I hoped it hadn't.

. . . .

Q. Your comment that the gun hadn't checked out, was that a true statement? A. At that time to my knowledge. I can't say it was true or not, but to my knowledge I was informed that the gun had not checked our at that point, yes.

Q. And you terminated that conversation fairly abruptly. Why did you do that? A. Fairly abruptly?

Q. I get it from the motion produced. A. I think we had a conversation about an hour and a half.

Q. And then you said you would see him the. next day? A. I asked him if I could come back to see him. He said he wouldn't do you any good, but, yes, you can come back.

Sisco returned to Kilby Prison at approximately 9:00 A.M. on June 6, 1978. Munro was given the *Miranda* warnings and signed a waiver form. Sisco then interviewed Munro for approximately two hours. After characterizing the interview of the previous day as "just basically general conversation," Sisco testified:

Q. All right. Now, was that also true with the second conversation? A. The second day I got a little bit more specific in my interviewing and I asked Dan why he didn't want to talk about the murders in Des Moines.

Q. What did he respond to that? A. He said if I confess to it then I don't have a chance for an appeal and I would just rather go to trial and take my chances on appeal. He also told me that you have got to look at my side of it. I just don't believe it would benefit me to talk about it now.

. . . .

Q. Did you ask him about any of those items of evidence [that Des Moines police were still searching for]? A. I asked him where the bullets were that he purchased or had an individual purchase for him in Des Moines, Iowa, and he told me that he thought the Iowa authorities had enough evidence on him as it was and he didn't want to tell me where they were.

Q. What was his appearance like when he told you this? A. Well, at that point basically like his appearance is here. He apparently showed no emotion.

Q. Was that also true when you discussed this part about talking about the crime? A. At one point during our conversation I related just a hypothetical situation to him regarding the crime and I observed what appeared to be eyes watering and his right arm trembled.

The only other interrogation of Munro which appears in the record occurred on July 6 and 7 while he was being transported by automobile from Alabama to Des Moines for trial. BCI Agent Wood accompanied Munro on that trip. Because no testimony was introduced at trial regarding that interrogation and because it occurred subsequent to the interrogation sessions which were referred to at trial, we do not consider the circumstances of that interrogation to be a relevant factor in determining the voluntariness of Munro's statements which were introduced at trial.

The interrogation sessions referred to at trial were the two May 3 interviews and the interviews of June 5 and 6. The reference to the May 3 morning session was essentially for the purpose of authenticating pictures of Munro's shoes which were taken at that time and were later introduced in evidence at trial. Testimony relating to the May 3 afternoon session explained to the jury how the police discovered the gun. We have already set forth Sisco's testimony in relevant part with regard to his June 5 and 6 conversations with Munro.

Munro bases his contention that his statements to interrogators were psychologically coerced on two factors: (1) the use of the

psychological profile that was compiled from information given by Munro's prior physician and attorney, and (2) the failure to provide Munro with an attorney when he first requested one.

After reviewing all the circumstances surrounding the custodial interrogation of Munro, we agree with the trial court the State has shown by a preponderance of the evidence that Munro's statements in the course of the interviews were voluntarily made. We note first that at each session he was informed of his rights and signed a waiver form. That alone of course does not establish his subsequent statements were voluntarily given. *State v. Jump*, 269 N.W.2d 417, 424 (Iowa 1978). The record also shows, however, that Munro is of above average intelligence and has had prior experience with the criminal law. *Id.* (defendant of "at least average intelligence"); *State v. Hansen*, 225 N.W.2d 343, 350 (Iowa 1975) (defendant had "prior experience of being interrogated"). No indication appears of physical mistreatment or of prolonged periods of interrogation. *See State v. Clough*, 259 Iowa 1351, 1358, 147 N.W.2d 847, 852 (1967). Neither does deceit or an improper promise appear. *See State v. Jacoby*, 260 N.W.2d 828, 833 (Iowa 1977). Munro himself requested the May 3 meeting with Sisco at which he divulged the location of the gun, and he specifically consented at the end of the June 5 interview to Sisco's return the next day. That Munro had enough control of his conduct to negotiate an agreement to have his gun tested first by the FBI confirms our belief that his will was not overborne during the interrogation process. *See Rhode Island v. Innis*, —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

With regard to the interrogators' use of a psychological profile based on allegedly privileged information, we note first that most of the information on which the profile was based can be found in Munro's Alabama prison records attributing to him "superior intelligence" and "schizophrenic reaction, paranoid type, in partial remission with alcoholism." This informa-

tion was compiled by the Alabama prison board's sanity commission apparently to determine whether Munro should be transferred from prison to a hospital. Because the examinations conducted by the prison board were for ascertaining Munro's mental condition rather than for treating him, the information in the prison records is not privileged. *State v. Mayhew*, 170 N.W.2d 608, 615 (Iowa 1969). *See also State v. Cole*, 295 N.W.2d 29 (Iowa 1980). We note also that section 622.10 of the Iowa Code, which provides the basis for the physician-patient and attorney-client privileges in Iowa, applies only to *testimonial* use of privileged information; it is not a bar to the manner in which the allegedly privileged information was used here. *See State v. Pepples*, 250 N.W.2d 390, 394 (Iowa 1977). Moreover, we are not convinced that the manner in which the interrogators used Munro's psychological profile in their interrogation overbore his will. We do not believe that by treating Munro with respect, addressing him as Mr. Munro, avoiding close contact, using only a single interrogator, breaking eye contact, and making an occasional reference to Munro's mother, the interrogators caused Munro to divulge information involuntarily.

With regard to the interrogators' failure to provide Munro with an attorney when he first requested one, we are aware of language which arguably requires the automatic exclusion of any statement made to police interrogators in the absence of counsel after a suspect has expressed a desire to see counsel and none had been provided. *State v. Moon*, 183 N.W.2d 644, 649 (Iowa 1971). In *Moon* we quoted *Miranda* and then stated:

> From the foregoing it becomes evident that whenever an in-custody accused in any manner or at any time invokes his right to counsel, any questions thereafter asked of, or statements made to him which are likely to, expected to, or do in fact elicit a confession, including the affixing of his signature to any inculpatory or exculpatory written document, consti-

**444**

tute a part of the *Miranda* proscribed interrogation process.

*Id.*

 The statement from *Moon* does not mean that once an interrogation begins and a suspect indicates a desire to have counsel that he can *never* again be questioned without counsel. We noted in *Moon* that "a suspect can at any time waive right to counsel." *Id.* at 647; *see Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966). Even if an in-custody accused has at one time indicated a desire for counsel, the State may nevertheless introduce evidence of later admissions if it (1) proves that interrogation ceased at the time the request for counsel was made, *id.*, at 473–74, 86 S.Ct. at 1627, 16 L.Ed.2d at 723, and (2) meets its "heavy burden" of demonstrating that the accused "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

 Munro's invocation of his right to counsel at the April 29 meeting does not render his later statements inadmissible under this record. Interrogation ceased when he requested counsel. He was not thereafter questioned in any manner until the morning of May 3, when Sisco provided him with Sisco's address and telephone number to permit him to contact Sisco if he decided to disclose the location of the gun. Sisco testified at the pretrial suppression hearing regarding the May 3 morning meeting that he could "not recall anybody telling me that [Munro] had requested an attorney at that point." The interrogation on the afternoon of May 3, at which Munro was given the *Miranda* warnings, signed a waiver form, and told Sisco of the location of the gun, occurred at Munro's request. On these facts the State has made the required showing. We hold as the district court did that Munro knowingly and intelligently waived his right to remain silent and to counsel at the time he made his statements. *See People v. Lewis*, 68 Cal.Rptr. 790, 794 (Cal.App. 1968) (confession admissible when given one day after counsel requested, but not yet

provided); *State v. Woods*, 182 Neb. 668, 672, 156 N.W.2d 786, 789–90 (1968) (statements admissible when the defendant failed to renew request for counsel after *Miranda* warnings).

III. *Footprint evidence.* Munro's final contention is that the trial court erred in admitting evidence of an alleged footprint shown in photographs of the crime scene. The State first argues that Munro "opened the door" to the challenged footprint evidence by questions his counsel asked during cross-examination of a witness for the State. The State further argues that even if Munro had not opened the door, his objection to the footprint evidence was deficient and that, in any event, a sufficient foundation was established for the evidence. We proceed no farther than the first argument.

The witness whose testimony is crucial on this issue is Officer John Kilgore. When first called as a State's witness, Kilgore testified only regarding his recovery of several bullets from the doctors who performed autopsies and from the scene of the homicides. Neither he nor the prosecutor made any reference to footprints found at the scene or shown in photographs of the scene. On cross-examination of Kilgore, defense counsel created an inference which the State possessed evidence to dispel, as we will subsequently relate. The cross-examination includes this:

Q. Officer Kilgore, you were at what is now called the Coney Island or the crime scene on February 19, 1978, were you not? A. Yes, sir.

Q. And you were there to take certain photographs?

State's Counsel: Object, Your Honor. Beyond the scope of direct examination.

The Court: Overruled. You may answer.

Q. You took certain photographs, did you not? A. Yes, sir.

. . . .

Q. Well, how about on the same date when, on February 19th, did you go back to the scene at a second time? A. I left the scene and did return, yes.

. . . .

Q. And for what purpose? A. I returned to photograph and recover an additional bullet that had been found.

. . . .

Q. Let me show you Defendant's Exhibit 39, and ask you to familiarize yourself with it first and see if you can identify that particular exhibit. A. Yes, sir. I am familiar with this exhibit.

Q. Can you locate on that particular exhibit where the spent or the bullet that you photographed a second time, can you point that out in that diagram? A. The approximate location, yes, sir.

. . . .

Q. Where is it located next to? A. It is located next to and to the west of an item called Bar No. 1 in the crime scene sketch. . . .

. . . .

Q. Now, throughout this scene here there were various footprint impressions or impressions that left certain track marks, isn't that correct? A. That is correct.

Q. Were there any photographs in this area where the bullet was discovered? Were there any photographs that you took specifically to look at for footprint impressions or some sort of track impressions? A. No.

. . . .

Q. Did you ever cause to be—did you ever examine for the specific purposes to determine whether or not there was a foot impression or some sort of impression left either by a footprint of a wheelbarrow, what have you, in this area where the "X" is for the purposes of testimony in this trial? [Objection.]

. . . .

Q. On February 19th did you? A. Did I what, sir?

Q. Did you examine in the crime scene photo of where the spent bullet was discovered any impressions that may have been characterized as a wheelbarrow or a footprint or what have you, anything like that? A. No, sir.

Later in the trial, Kilgore was again called as a witness for the State. He was allowed to testify over objection that Munro's shoes had a crosshatch pattern on their soles and that the photographs of the floor at the scene of the crime referred to by Munro's counsel during prior cross-examination of Kilgore also showed a crosshatch pattern. The portion of the crime scene photograph containing such a pattern was circled and shown to the jury.

This court has stated, "Where the direct examination creates an inference as to the existence of a fact not directly testified to, the witness may be cross-examined to rebut such inference." *Wheatley v. Heideman*, 251 Iowa 695, 710, 102 N.W.2d 343, 353 (1960) (citations omitted). The same rule has been applied to reverse situations— where cross-examination creates an inference, the witness may rebut the inference on redirect examination. *State v. Kendall*, 200 Iowa 483, 486, 203 N.W. 806, 807 (1925); *see* 98 C.J.S. *Witnesses* § 419c (1957). For example, in an early Iowa case the defendant was accused of criminal conversation with the plaintiff's wife. *Stumm v. Hummel*, 39 Iowa 478 (1874). The wife was asked on cross-examination regarding certain occasions of "indecent familiarity" with the defendant. This court held that on redirect examination she was properly allowed to answer more general questions as to whether indecent conduct between her and the defendant had ever occurred. *Id.* at 481.

Cases from other jurisdictions also provide guidance for resolution of this issue. *State v. Linebarger*, 71 Idaho 255, 232 P.2d 669 (1951); *People v. Regina*, 19 N.Y.2d 65, 224 N.E.2d 108, 277 N.Y.S.2d 683 (1966); *State v. Kessler*, 254 Or. 124, 458 P.2d 432 (1969).

In *Linebarger* a rape victim was asked on cross-examination whether she said anything to her friends immediately after the incident. She responded, "No." On redirect examination she was asked "when and to whom she made complaint." The Idaho Supreme Court held that the trial court did not abuse its discretion in permitting the

latter question, since it pertained to matters "referred to on the cross-examination." 71 Idaho at 258, 232 P.2d at 671.

In *Regina* a police officer was asked on cross-examination whether he made any notes on the night he observed an occurrence. The officer responded, "No." On redirect examination the officer was asked if he had ever made any notes of the occurrence in question, to which the officer responded that he made notes three days after the incident. The New York Court of Appeals found the latter testimony proper in that it "did no more then to explain, clarify and fully elicit a question only partially examined by the defense." 19 N.Y.2d at 78, 224 N.E.2d at 115, 277 N.Y.S.2d at 693.

In *Kessler* an assault victim who identified the defendant was asked on cross-examination whether he had been shown photographs of suspects prior to the trial. The witness answered affirmatively. On redirect examination the witness was asked about the procedure followed by police in presenting the photographs to the witness and was allowed to testify that he was presented nine photographs of suspects from which he chose the defendant. The Supreme Court of Oregon found no error in admitting the latter testimony, stating:

> The victim's testimony brought out on crossexamination revealed to the jury that he had been shown photographs of persons who might have committed the crime. Without more the jury could have inferred that the victim was unable to identify the defendant from any of the photographs shown to him. This would certainly weaken the witness' identification in court. Under these circumstances the state was entitled to overcome this possible inference by showing that the witness had identified defendant in one of the photographs.

254 Or. at 127, 458 P.2d at 434. *See also State v. Campbell,* 294 N.W.2d 803, 808 (Iowa 1980) (defendant opens door to otherwise inadmissible breath test by testifying "to his alcohol consumption and introducing evidence which converted that to blood-al-

cohol levels"); *State v. King,* 225 N.W.2d 337, 341 (Iowa 1975); *State v. Sage,* 162 N.W.2d 502, 504 (Iowa 1968); *State v. Chambers,* 179 Iowa 436, 444–45, 161 N.W. 470, 473 (1917); *State v. Benson,* 154 Iowa 313, 315–16, 134 N.W. 851, 852 (1912); 24A C.J.S. *Criminal Law* § 1843, at 589–92 (1962) ("Thus appellant or plaintiff in error is estopped to complain of error in the admission of evidence, where the evidence . . . was in rebuttal or explanatory of his evidence").

Applying this rationale, we hold that the trial court did not abuse its discretion in admitting Kilgore's testimony regarding the nature of the alleged footprint at the scene of the crime and the pattern on the soles of Munro's shoes. *Stumm, Linebarger, Regina,* and *Kessler* illustrate the proposition that when the jury may draw an adverse inference from testimony given on cross-examination of a party's witness, the party may rebut the inference by further questioning.

That is precisely what happened here. Munro was first to raise the issue of whether footprints were found at the scene of the crime. While cross-examining Kilgore, Munro's counsel obtained an admission by Kilgore that although footprints appeared on the floor at the scene of the crime, no photographs were taken of the floor for the purpose of looking for footprint impressions, and that on February 19th Kilgore did not observe "any impressions that may have been characterized as a wheelbarrow or a footprint" in a photo taken of the scene. From this testimony the jury could infer that Kilgore was *never* able to discover any indication of a footprint in the photo. Actually according to Kilgore, he discovered an apparent footprint in the photo *after* February 19 which was similar to the soles of Munro's shoes. The possible adverse inference arose because Kilgore answered "no" to a question concerning the truth of a certain allegation at a particular time. We hold that Kilgore was properly allowed to rebut that possible inference.

Defense counsel made a tactical choice in cross-examining Kilgore. He created an in-

ference to help his client, but he also opened the door to rebuttal by the State. We do not agree with Munro's contention that the prosecutor was the one who first "injected this issue of comparisons into the record." The State did begin laying a foundation for footprint evidence early in the trial by introducing Munro's shoes into evidence and also by asking the police officers who were present at the scene about the patterns on the soles of their shoes, to eliminate the possibility that they made the footprint in question. But Munro's shoes were originally admitted by the trial court for a specific purpose unrelated to footprint comparison—to show that they were the same shoes as those worn by a man, allegedly Munro, when he resided in Des Moines under a different name at the time of the homicides. At that stage in the trial no mention was made of footprints found at the scene. Even if we were to accept Munro's contention that "[t]here is no question . . . as to what use the State intended to put this evidence," we believe the trial court was justified in allowing the prosecutor to dispel an inference created during cross-examination that no such evidence existed. *See Shorter v. United States*, 412 F.2d 428, 431 (9th Cir.), *cert. denied*, 396 U.S. 970, 90 S.Ct. 454, 24 L.Ed.2d 436 (1969).

We also reject Munro's contention that the admissibility of the footprint evidence had been determined by the trial court prior to the time that it was introduced by either party. *See State v. Jones*, 271 N.W.2d 761, 766 (Iowa 1978). In *Jones* we held the defendant did not waive his right to challenge certain evidence introduced by him where the trial court had previously ruled such evidence admissible. *Id.* In this case the court had not, at the time Munro's counsel first cross-examined Kilgore, ruled on Munro's motion in limine to exclude footprint evidence. Munro's reliance on *Jones* and similar cases is not well founded.

Munro's assignments of error are not meritorious.

AFFIRMED.