STATE of Iowa, Appellee,

v.

John Lee HRBEK, Appellant.

No. 67902.

Supreme Court of Iowa.

July 20, 1983.

Francis C. Hoyt, Jr., Chief Appellate Defender, and Scott Rosenberg and Fern Shupeck, Asst. Appellate Defenders, for appellant.

Thomas J. Miller, Atty. Gen., Michael K. Jordan, Asst. Atty. Gen., and Joseph Hrvol and Michael Winter, Asst. County Attys., for appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, SCHULTZ, CARTER and WOLLE, JJ.

McCORMICK, Justice.

Defendant John Lee Hrbek appeals his conviction by jury and sentences for two counts of first-degree murder based on the shooting deaths of Stanley Fisher and his mother Kate Fisher. The same incident was involved in *State v. Chadwick*, 328 N.W.2d 913 (Iowa 1983). We find that trial counsel's failure to preserve error on the admissibility of defendant's alleged inculpatory statements was so egregious it denied him his constitutional right to effective assistance of counsel under U.S. Const. amend. VI and XIV. Because we find no basis for reversal of the convictions in the present record, however, and no hearing has been held on the admissibility of the statements, we conditionally affirm the trial court and remand the case for an evidentiary hearing on the admissibility issue.

The specific issues are whether the trial court erred in failing to hold a hearing out of the presence of the jury to determine whether alleged statements of the defendant were made after valid waiver of his *Miranda* rights, whether the trial court erred in overruling defendant's motion to exclude the State's rebuttal evidence of those statements, and whether defendant was denied effective assistance of counsel because of counsel's failure to protect his rights as to those statements and in other respects. We first summarize the relevant evidence.

The State's evidence was that defendant was a passenger in a red Toyota pick-up truck operated by Charles Chadwick which stopped in a farm lane along highway 275 south of Council Bluffs during the morning of September 16, 1981. A black Datsun driven by Kate Fisher subsequently stopped at the end of the lane, and a blue Corvette driven by Stanley Fisher arrived soon afterward. According to the State's evidence, Chadwick shot and killed Kate Fisher and defendant shot and killed Stanley Fisher. Stanley was found slain on the front seat of his car with his seatbelt still on, and Kate was found on the ground outside her car.

The State offered evidence from which the jury could find that on the afternoon before the killings defendant and Chadwick drove their vehicle slowly past the Fisher farm twice and also interfered with Kate Fisher as she drove back to work after lunch on that date. The Fishers saw the truck parked near their farm the next morning. Stanley L. Fisher, Kate's husband and Stanley's father, testified the pick-up left the site at a high rate of speed when his son started toward it in his vehicle. The father last saw his son driving toward Council Bluffs at approximately 90 miles per hour. Kate Fisher left the farm in her car shortly after her son, turned in a different direction, and apparently located the pick-up in the lane where the shootings subsequently occurred. Defendant and Chadwick were apprehended shortly after the shootings following a high-speed chase in Council Bluffs.

Defendant testified, against his lawyer's advice, in his own defense. He asserted Chadwick was merely an acquaintance with whom he had been out socially the evening before the killings. He said they ended up spending the night in Chadwick's Omaha apartment. The next morning, according to defendant, Chadwick asked defendant to go with him to meet a man who owed him some money. Defendant said he did not know the man's name but had received telephone calls earlier in the week from a man identifying himself as "Fisher" and warning him "if I valued my family's lives to stay away from [Chadwick]."

When they got in the truck on the morning of September 16, 1981, defendant said he dozed off and did not awaken until the truck was on a highway in Iowa. He said he then learned for the first time they were going to the Fisher farm. He testified that he insisted Chadwick take him home and that Chadwick agreed to do so. While they were traveling north on highway 275 toward the interstate to return to Omaha, a black Datsun later determined to be Mrs. Fisher's began to pursue them. He said they pulled into a farm lane to get help, but no one appeared to be home. The Datsun blocked the lane, and Chadwick started toward it. At about that time a blue Corvette "came out of nowhere" and headed at Chadwick. Then, according to defendant, Chadwick shouted to defendant to get out of the truck and warned him the driver of the Corvette had a gun. Defendant said Chadwick fired at the car but it kept coming toward the truck. Defendant said he picked up a pistol he had lying between the seats in the pick-up and shot out a tire of the Corvette, stopping it. He asserted he then got out of the truck and went up to the driver's door of the Corvette and saw a man lying on the seat who suddenly jumped up at him. He testified he then fired his pistol at the man to protect himself. Defendant said that from then on he was in shock and just followed Chadwick's orders, although he wanted to turn himself in.

Because defendant claimed to have been an unwilling participant in the events, the prosecutor on cross-examination sought to show that defendant and Chadwick had confronted Kate Fisher in the black Datsun on the previous afternoon. The following colloquy occurred:

Q. Did you . . . and Mr. Chadwick . . . have any confrontation with Mrs. Fisher's vehicle on the afternoon of the 15th? A. No.

. . . . .

Q. Did you ever tell anybody that you and Charley had a confrontation with Mrs. Fisher's vehicle on the afternoon of the 15th? A. No, sir.

On rebuttal, the State called deputy sheriff Jerry Quigley in an effort to impeach defendant's testimony on this subject. He testified as follows:

Q. Mr. Quigley, were you present at the conversation at the County Attorney's Office involving this defendant . . . on or about the 21st day of September, 1981? A. Yes, sir, I was.

Q. And this defendant has indicated on his direct testimony and cross examination that at that time he did not mention any contact with Mrs. Fisher . . . at any time prior to the shooting, her shooting death. Did he make any other statement in that conversation which does not reflect that view? A. Yes, sir he did.

Q. What did he say? A. He was asked—it was, more or less, he was asked if they had seen Kate Fisher—

MR. O'SULLIVAN: I'm going to object and ask that there be foundation laid as to the Miranda aspects of this.

MR. HRVOL: Are you going to sustain that, Judge?

THE COURT: Yes.

By Mr. Hrvol:

Q. Officer Quigley, can you tell us if you had occasion to talk to Mr. Hrbek prior to this conversation in the County Attorney's Office on September 21st relative to his rights under the Miranda decision? A. Yes, sir.

Q. Can you tell us if you explained those rights to him on your way to the County Attorney's Office? A. Yes sir.

Q. Who was with you at the time that you explained to him his rights? A. Chief Deputy Duane Otto.

Q. And did he accompany you to the County Attorney's Office after those rights were read to him? A. Yes sir.

Q. Can you tell us what you advised him if you can recall? A. Read him his rights per Miranda that he had the right to remain silent; anything he said could be used against him in a court of law; that he had a right to be represented by counsel; that if he could not afford counsel, the State would appoint one at their expense; that he had the right to have that attorney present with him during any and all questioning.

Q. Did he indicate an understanding of those rights to you? A. Yes, sir, after each right he was asked if he understood that right.

Q. And what was his response, if you know? A. Yes.

Q. After he had arrived at the office, did he in fact converse with yourself and other members of the staff that were present? A. Yes, sir, he did.

Q. Now, Officer Quigley, can you tell us if in fact any statements he made at that time touched upon the area that we just—that I asked you initially? A. Yes, sir, he did.

Q. Can you tell us what question was asked and what the response was, as best you know? A. Whether he was out at the Fisher farm the day before the shooting. Yes.

Q. Yes? A. "Yes" he answered.

Q. Can you tell us, Officer Quigley, if he ever mentioned any contact with Mrs. Kate Fisher on the date—around the date of the shooting, prior to her shooting-death? A. Yes, sir.

Q. And can you tell us what the substance of that conversation was, if you know? A. That he and Charley Chadwick had attempted to run her off the road two times the day before the shooting.

Q. Did he admit doing it two times or one time? A. No, sir, he stated they did that only once.

On cross-examination, Quigley said chief deputy Duane Otto, county attorney David Richter and assistant county attorney Joseph Hrvol were present during the conversation. He also testified as follows:

Q. Had you made any statements to him with reference to your desire to implicate this Mrs. Fisher [the estranged wife of Stanley, the victim] in the case? A. The, more or less, conversation was as to what knowledge he had of the whole incident.

Q. And in addition to that, was there a reward offered to him at that time if he did implicate Mrs. Fisher? A. Dollar award? or?

Q. No, I mean, anything promised to him? A. Only that some slack might be cut to him in the murder of Mrs. Fisher.

Q. So that there was an inducement offered to him in order for him to make these statements that might implicate Mrs. Fisher in the proceedings; is that correct? A. Yes, sir.

Q. And who made those statements to him? A. I believe they were by Dave Richter.

Q. Was that the extent of the conversation? A. No, sir.

Q. But that is the extent of the conversation which was inquired in to by Mr. Hrvol; is that it? A. Yes, sir.

Q. Did the County Attorney state to Mr. Hrbek in your presence that if he didn't implicate Kay Fisher, things would go bad for him? A. No, sir, he was informed of what we already had on him.

Q. And was there a statement made that unless he co-operated in an attempt to implicate Mrs. Fisher, things would go hard on him in this case? A. No, sir.

Q. But the statement was made that you and the County Attorney were interested in bringing her into the case? A. Referring to who?

Q. Mrs. Fisher, the widow. A. Yes, sir; yes, sir.

Q. And it was after those statements were made that he made the statements

that you have testified to here this morning? A. I'm not sure.

Q. They precede in time these statements? A. I believe so, yes, sir.

. . . . .

MR. O'SULLIVAN: I move that the testimony be excluded.

THE COURT: Overruled.

I. *The Miranda hearing.* Defendant's trial counsel, a different attorney than is representing defendant on appeal, did not file a pretrial motion to suppress evidence of defendant's statements. Iowa R.Crim.P. 10(2) and (4) provide that motions to suppress evidence must be urged prior to trial and not later than 40 days after arraignment. Failure to do so constitutes waiver of the motion "but the court for good cause shown, may grant relief from the waiver." Rule 10(3). Defense counsel's first mention on the record of a *Miranda* issue appears during the direct examination of Quigley when he was offered as a rebuttal witness. Even then no request for suppression was made. In addition, no excuse was offered for not having made a timely motion to suppress the statements as required by the rules of criminal procedure.

We need not decide, however, whether defendant waived his *Miranda* objection on the ground either of untimeliness or inadequacy. Nor need we determine whether, if he made a timely and effective objection, the court should have held a hearing outside the presence of the jury on the issue on its own motion. This is because an order suppressing the statement on *Miranda* grounds would not preclude its use for impeachment. *See Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *State v. Donelson,* 302 N.W.2d 125 (Iowa 1981). Because the statements were offered only as impeachment in the present case, the *Miranda* issue is a moot point.

■ II. *The motion to exclude.* In contending the trial court also erred in overruling his motion to exclude Quigley's rebuttal testimony, defendant characterizes the motion as a challenge to the voluntariness of his alleged statements. An involun-

tary statement cannot be used against a defendant at trial for any purpose. *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290, 306 (1978). Therefore that issue was not moot. The motion to exclude, however, was plainly insufficient to raise a voluntariness challenge under this court's holding in *State v. Washington,* 257 N.W.2d 890, 895–96 (Iowa 1977), *cert. denied,* 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978). Counsel did not mention the term voluntariness, did not specify a ground for the motion, and did nothing otherwise to alert the trial court to a voluntariness attack.

■ In addition, the motion was untimely. Defendant neither filed a timely pretrial motion to suppress raising the voluntariness ground nor did he allege and establish good cause for having failed to do so as required by Iowa R.Crim.P. 10(2)–(4). In these circumstances he is deemed to have waived the objection. *See State v. Beeman,* 315 N.W.2d 770, 778–79 (Iowa 1981); *State v. McCowen,* 297 N.W.2d 227, 228 (Iowa 1980). Although the record suggests defense counsel may have learned of the alleged inducement for the inculpatory statements for the first time during cross-examination of Quigley's rebuttal testimony, he did not seek relief under rule 10 on this basis and it is merely speculative.

Defendant now relies on *State v. Cooper,* 217 N.W.2d 589 (Iowa 1974), as support for the timeliness of the motion. That case merely demonstrates circumstances in which good cause for a late motion may be established. Defendant did not allege and show that he was excusably unaware before the Quigley testimony of the alleged involuntariness of his inculpatory statements. Moreover, *Cooper* was decided before adoption of the rules of criminal procedure and thus was unaffected by the waiver provisions of rule 10.

We conclude that defendant did not preserve error or make a timely motion on the voluntariness issue.

III. *Effectiveness of counsel.* We observed in *Washington v. Scurr,* 304 N.W.2d 231, 235 (Iowa 1981), that "failure to pre-

serve error may be so egregious that it denies a defendant the constitutional right to effective assistance of counsel." When a defendant relies on a specific act or omission to establish ineffective assistance, two conditions must be satisfied: "It must be shown that 1) counsel failed to perform an essential duty, and 2) prejudice resulted therefrom." *Snethen v. State,* 308 N.W.2d 11, 14 (Iowa 1981).

No justification has been suggested and we can think of none that would explain trial counsel's failure to move to suppress the inculpatory statements on voluntariness grounds. We see no way to attribute counsel's omission to mere improvident trial strategy, miscalculated tactics or mistaken judgment. Thus the present record is adequate for decision of the effectiveness issue. *See State v. Schoelerman,* 315 N.W.2d 67, 71 (Iowa 1982). If counsel was excusably unaware of grounds for a suppression motion earlier, he was certainly aware of grounds by the conclusion of Quigley's testimony when he made the motion to exclude it. Grounds sufficient to make the motion essential appeared in the testimony of Quigley during cross-examination that before defendant made the inculpatory statements Richter told him that "some slack might be cut to him in the murder of Mrs. Fisher."

■ To be admissible, a confession must be " 'free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' " *Brady v. United States,* 397 U.S. 742, 753, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747, 759 (1970). Statements are involuntary when induced by promises of leniency. *See State v. Hodges,* 326 N.W.2d 345 (Iowa 1983); *State v. Ware,* 205 N.W.2d 700 (Iowa 1973); *State v. Mullin,* 249 Iowa 10, 85 N.W.2d 598 (1957).

The alleged inculpatory statements were critical evidence in this case. The evidence had the effect, if the jury believed it, of totally undermining the defense. If counsel made a timely motion or established good cause for making a late motion, the court would have been obliged to conduct a fair hearing outside the presence of the jury at which both the underlying factual and legal issues would have been actually and reliably determined. *State v. Walton,* 247 N.W.2d 736, 739 (Iowa 1976).

■ We find it was essential for trial counsel to move to suppress the statements on voluntariness grounds. If the statements were involuntary, counsel's dereliction had the effect of materially prejudicing the defense. Counsel's omission was the kind of fundamental error that has resulted in findings of ineffective assistance of counsel in other cases. *See, e.g., Boyer v. Patton,* 579 F.2d 284 (3rd Cir.1978) (failure of trial counsel to object to testimony concerning defendant's post-arrest silence); *Sincox v. United States,* 571 F.2d 876 (5th Cir.1978) (failure of counsel to perfect an appeal); *Rinehart v. Brewer,* 561 F.2d 126 (8th Cir. 1977) (failure to pursue certain defenses and to explain consequences of guilty plea); *United States v. Easter,* 539 F.2d 663 (8th Cir.1976) (failure to move to suppress evidence obtained in search). We therefore conclude that trial counsel's failure to move to suppress the evidence denied defendant his constitutional right to effective representation of counsel guaranteed him by the sixth and fourteenth amendments of the United States Constitution.

■ We have considered defendant's other grounds for claiming trial counsel was ineffective. He asserts that counsel was ineffective in failing to object to questions outside the scope of direct examination. We believe the questions were within the issues covered on direct examination. *See State v. Munro,* 295 N.W.2d 437, 445 (Iowa 1980). Defendant also asserts trial counsel should have objected and moved for mistrial on the ground of prosecutor misconduct. We do not believe the instances he relies on can fairly be characterized as prosecutor misconduct. We would be concerned by the prosecutor's questions concerning whether defendant was a hired killer but for defendant's eventual acknowledgement that he may have told the officers a false story that he was indeed hired to kill the

Fishers. We do not agree with defendant's assertion that this evidence was beyond the issues explored on direct examination.

 Defendant also complains of counsel's failure to object to Quigley's testimony as improper rebuttal, to certain allegedly irrelevant and inadmissible opinion evidence, and to a jury instruction. We find no merit in any of these complaints. We hold that counsel was ineffective only in failing to challenge the voluntariness of the inculpatory statements.

As a consequence of trial counsel's failure, defendant was not afforded a hearing on the voluntariness of the statements. If the statements were involuntary, they were not admissible even as impeachment. In that event he would be entitled to a new trial. If the statements were voluntary, they were admissible for impeachment purposes, and he is not entitled to relief.

We are not in a position to decide the voluntariness issue because it was not determined in the trial court. The trial court must decide that issue after an appropriate evidentiary hearing. *See State v. Hall,* 235 N.W.2d 702, 731 (Iowa 1975).

We therefore remand the case for a voluntariness hearing. If the trial court determines the statements were involuntary, a new trial shall be granted. If not, judgment shall stand affirmed.

AFFIRMED ON CONDITION AND REMANDED WITH INSTRUCTIONS.

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent. I am not able to determine on the present record that under all potential circumstances, including both that which is known and that which is unknown, counsel's performance was not within the range of normal competency. Accordingly, I am not willing so to declare at this time. For this reason and also because the present case requires an evidentiary hearing in the district court in any event, I would affirm the judgment and relegate defendant to such remedies, if any, as may be available to him under our postconviction relief statutes.