Lisa Nicole Pierce appeals her conviction, following jury trial, for forgery. She contends the district court erred in admitting evidence of statements she made to the police because such statements were involuntary. We reverse and remand for new trial.
I. BACKGROUND FACTS AND PROCEDINGS.
The record reveals the following facts. On November 19, 2005, Pierce attempted to purchase items from the Dollar General Store in Story City with a counterfeit one-hundred-dollar bill. When the manager of the store realized the bill was counterfeit she called the police. Officer Brice Haskin of the Story City Police Department responded to the call at the Dollar General Store, arriving at the store at approximately 3:30 p.m. The manager identified Pierce as the person from whom she received the bill. Haskin took possession of the bill in question and spoke with Pierce. He requested to speak with Pierce in his patrol car. She consented and after a brief conversation asked if Officer Haskin could take her children somewhere so they could speak in private. Haskin agreed and dropped the children off at the home of a friend whom Pierce had contacted.
Haskin and Pierce then went to the Story City Police Department. The police department is located in the same building as City Hall and initially Haskin took Pierce through the police department and into the city council chamber to interview her. Haskin informed Pierce of herMiranda[1] rights and she signed a waiver of those rights at 4:00 p.m. He also told her she was not under arrest. Haskin testified that Pierce was free to leave during the entire interview but that he had never told her so.
Not long after signing the waiver Pierce began to cry. She stated she had received the one-hundred-dollar bill earlier that day as payment for cleaning she had done for a man in town. Haskin continued to ask questions seeking more information about the person who had given her the bill, and was not convinced Pierce was telling the truth.
Pierce then gave Officer Haskin a different version of the facts, stating she had gotten the bill at a bar. She wrote out this second version of what occurred, stating that the bill had been on a board at a bar in Boone, she and her friend joked about the bill and took it off the board, and she had put it in her purse. Pierce stated she had other one hundred dollar bills in her purse and in the process of cleaning out her purse she must have mistakenly thrown away a real bill and kept the one from the bar. Pierce asserted she did not know the bill she gave to the clerk was counterfeit. This statement was given at approximately 4:40 p.m. At some points during the interview, Pierce told Haskin that she was crying because she wanted to be with her children as she only got to see them every two weeks.
Haskin again doubted Pierce's version of the events. At approximately 5:00 p.m. Haskin called Officer Muhlenburg for advice and assistance. Muhlenburg arrived at the station around 5:15 p.m. to assist Haskin with the questioning and investigation. Both officers went into the council chambers and spoke with Pierce. Officer Muhlenburg asked her if they could search her car and she agreed. Pierce then accompanied the two officers to her car to search it. The search revealed nothing and the trio returned to the police station.
Once back at the station, the officers kept Pierce in the police department itself rather than taking her into council chambers as Haskin had done earlier. The officers questioned Pierce again together for a short time, until Officer Muhlenburg left to check on another one hundred dollar bill that had been passed at the same Dollar General Store on November 4, 2005. He discovered that both bills had the same serial number. Muhlenburg accused Pierce of passing both bills and she denied it. Throughout the entire interview process Pierce continued to cry at times. Officer Haskin testified he interpreted Pierce's statements about wanting to be with her children as meaning she was concerned about being away from them if she was charged with and convicted of a crime, and not that she wanted to be with them immediately.
Muhlenburg then left again to make some more phone calls, leaving Haskin alone with Pierce. Officer Haskin told Pierce he still was not convinced her statement was true, and neither was Officer Muhlenburg. Haskin told Pierce that honesty was the best policy, she did not want to be away from her children any longer than she had to be, she would probably have fewer charges brought against her or might even be charged with nothing if she told the truth, and the officers could file a few other charges against her if they wished. He also told her that Officer Muhlenburg would not be as nice as he was. Haskin testified that what he meant by this latter statement was that if she lied to Muhlenburg then Muhlenburg might charge her with more offenses, but he did not intend to communicate any physical threat to Pierce.
Directly following these statements by Haskin, Pierce told him she wanted to give another statement and to ask Officer Muhlenburg to come back in the room. Muhlenburg returned, spoke with Pierce for fifteen to twenty minutes, and then asked if she would write another statement. At 6:40 p.m. Pierce wrote a second statement, giving a third version of events concerning the one-hundred-dollar bill. She explained that three months earlier she had given a man she did not know three hundred dollars in one-hundred-dollar bills for some drugs. He returned a couple of hours later, told her he could not get the drugs, and returned what she thought was her money. She later noticed the bills were "fake" and threw a damaged one away but kept the other two. She then forgot about the bills for a while, and when she rediscovered them she used one of the bills at the Dollar General Store on November 4, 2005 and the other one that day. None of the above-described interviews with Pierce were electronically recorded in any manner.
The State charged Pierce by trial information with two counts of forgery, in violation of Iowa Code sections 715A.2(1)(c) and715A.2(2)(a)(1) (2005). Pierce filed a motion to suppress. She argued the statements she made to police should be suppressed because they were not made voluntarily and were inadmissible under the state and federal constitutions. Pierce testified at the suppression hearing that she would not have given her confession if it were not for Haskin keeping her away from her children, leading her to believe she would face fewer charges, and telling her the other officer would not be as nice to her.
The district court denied the motion to suppress, concluding
 that while the police officers trod very close to the line in questioning Pierce, they stopped short of stepping over it. In particular, Officer Haskin's statement that Officer Muhlenburg "might not be as nice as me" is of concern. The statement, taken in context, does not rise to the level of an overt threat or promise. If the version of events related by Pierce were to be believed in their entirety, the atmosphere may have been considered coercive. Again, the Court finds her testimony to be less than entirely credible.
The two counts were severed and the trial on Count I, the November 4, 2005, incident was continued. Trial proceeded on Count II, the November 19, 2005, incident only. During trial Pierce again objected to the admission of her statements to the police on evidentiary grounds arguing the statements were not sufficiently reliable to be admitted. The court overruled the objections and the evidence was admitted. The jury found Pierce guilty. The court sentenced Pierce to an indeterminate term of imprisonment of no more than five years, to pay a fine and surcharges, and to pay restitution. The court suspended the prison sentence and placed Pierce on probation for two years, and dismissed Count I of the trial information.
Pierce appeals, contending the court erred in admitting her statements to the police because such statements were not made voluntarily. She argues the court erred both in denying her motion to suppress her statements to the police on federal and state constitutional grounds, and in overruling her objections to the admission of such statements on evidentiary reliability grounds. More specifically, she contends Officer Haskin threatened her when he told her Officer Muhlenburg was not as nice as he is and when he told her they had additional charges they could file against her if she did not tell the truth, and promised her that she would face fewer charges or no charges and would have a better opportunity to see her children if she told the truth. She argues his threats and promises of leniency rendered her statements involuntary and thus inadmissible.
II. SCOPE AND STANDARDS OF REVIEW.
 [W]here there is no dispute as to the words used or their obvious meaning and the circumstances surrounding the expressions, then it is a matter of law upon which the court must pass and, in doing so, answer the query as to whether there appeared some assurance that the accused might gain in some manner related to his punishment by issuing the solicited statement relative to his guilt.
State v. Mullin, 249 Iowa 10, 15, 85 N.W.2d 598, 601
(1957). Our supreme court has subsequent to Mullin made it clear that under circumstances such as described inMullin, no dispute as to the words, their meaning, and surrounding circumstances, admissibility is decided on an evidentiary basis and not a constitutional basis. See Statev. McCoy, 692 N.W.2d 6, 27-28 (Iowa 2005). In the present case Pierce's interviews were not recorded, there appear to be some disputes as to the exact words used by the police officers, there are disputes concerning the meanings of some of the statements made by the officers and by Pierce, and the exact circumstances surrounding some of the statements are not entirely clear. Accordingly, we do not believe the record is sufficiently clear to analyze this issue on an evidentiary basis as a matter of law. See e.g., Mullin, 249 Iowa at 14,85 N.W.2d at 600 ("[I]f it clearly appears the confession was induced by force, threats, promises, or other inducements, the question is one of law for the court. . . ."). We therefore review Pierce's claim, that her inculpatory statements were involuntary, by making an independent de novo review of the totality of the circumstances. State v. Rhiner,352 N.W.2d 258, 262 (Iowa 1984); State v. Dhondt,325 N.W.2d 761, 762 (Iowa Ct.App. 1982). This "is in turn determined by `the facts surrounding the inculpatory statement . . . their psychological impact on the defendant, and . . . the legal significance of defendant's reaction.'" Dhondt,325 N.W.2d at 762 (quoting State v. Cullison,227 N.W.2d 121, 127 (Iowa 1975)).
In our review of the district court's ruling on a motion to suppress we consider both the evidence presented during the suppression hearing and that introduced at trial. State v.Jackson, 542 N.W.2d 842, 844 (Iowa 1996). We give deference to the district court's findings, but are not bound by them.State v. Turner, 630 N.W.2d 601, 606 (Iowa 2001).
III. MERITS.
"The test for determining the admissibility of confessions or inculpatory statements is voluntariness." State v.Munro, 295 N.W.2d 437, 440 (Iowa 1980). The State has the heavy burden of establishing that defendant's statements were voluntary and not induced by threat or promise of leniency.Rhiner, 352 N.W.2d at 263. We determine the issue of whether officers have exercised coercion so as to render statements involuntary by examining the totality of the circumstances. State v. Hodges, 326 N.W.2d 345, 347
(Iowa 1982).
 The question of voluntariness is a matter of sorting out the impetus for the inculpatory statement. To be admissible the statement must freely emanate from the mind of the speaker. If the statement is not the product of rational intellect and free will, but results from a promise of help or leniency by a person in authority it is not considered voluntary and is not admissible. . . .
Id. at 348 (internal quotations and citations omitted).
 An officer can ordinarily tell a suspect that it is better to tell the truth. The line between admissibility and exclusion seems to be crossed, however, if the officer also tells the suspect what advantage is to be gained or is likely from making a confession. Ordinarily the officer's statements then become promises or assurances, rendering the suspects statements involuntary.
 Id. at 349 (emphasis added). In order for a statement to be considered free and voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." State v. Ware, 205 N.W.2d 700, 703 (Iowa 1973) (quoting Brady v. United States, 397 U.S. 742, 753, 90 S. Ct. 1463, 1471-72, 25 L. Ed. 2d 747, 759 (1970)).
 Many factors bear on the issue voluntariness. These include the defendant's knowledge and waiver of his Miranda rights; the defendant's age, experience, prior record, level of education and intelligence; the length of time defendant is detained and interrogated; whether physical punishment was used, including the deprivation of food or sleep; defendant's ability to understand the questions; the defendant's physical and emotional condition and his reaction to the interrogation; whether any deceit or improper promises were used in gaining the admissions; [and] any mental weakness the defendant may possess.
Hodges, 326 N.W.2d at 348 (internal citations omitted) (emphasis added).
Our supreme court has not hesitated to exclude from evidence inculpatory statements which followed shortly after officers made implied threats or implied promises of leniency. SeeRhiner, 352 N.W.2d at 263-64 (holding clear impetus for defendant's inculpatory statements was officer telling him during questioning that "other charges might be filed against him if he didn't cooperate with the investigation" and thus statements were involuntary); State v. Hrbek,336 N.W.2d 431, 436 (1983) (case remanded for voluntariness hearing where officer testified he told defendant "some slack might be cut to him" on the charges); Hodges, 326 N.W.2d at 349
(finding statements involuntary after officer told him they believed he had committed the offense and that "there would be a much better chance of him receiving a lesser offense than first degree murder" if defendant gave a statement); Ware,205 N.W.2d at 701-703 (statement found involuntary where officer told defendant "it would go easier if he wanted to tell us anything"); Mullin, 85 N.W.2d at 602-03 (statements held involuntary where officer, a friend of defendant, told defendant he would "get farther with the Court by telling the truth").
Applying the standards and factors set forth above to the totality of the circumstances of this case, we conclude Pierce did not freely and voluntarily make her inculpatory statements to the police. Pierce was advised of her Miranda rights and validly waived those rights. She was also informed at least twice that she was not under arrest; however she was never told she could leave or had the right to leave whenever she wanted. Pierce was interviewed for approximately three hours by one to two officers, initially in the city council chambers adjacent to the police station and later in the police station itself following the search of her car. During the three-hour interrogation Pierce began to cry several times and, according to Haskin's written report, repeatedly stated that "all she wanted to do is see her children because she only gets them every two weeks." Haskin testified that he believed this was simply an indication she did not want to go to jail, not that she wanted to end the interview and see her children immediately. At the suppression hearing Pierce testified she meant she wanted to see them immediately and made this clear to Haskin.
The critical impetus for Pierce's inculpatory statements seems clearly to have been Officer Haskin's statements to her after they returned to the police station following the search of her car. At that point Pierce had already made two statements regarding the counterfeit bill, both generally to the effect she did not know it was counterfeit when she passed it, and after each Haskin told her he did not believe her story and did not think she was telling the truth. Haskin first told Pierce there were a few potential charges they could file against her if they wished if she did not tell the truth and that there was either a probability or possibility she would have fewer charges brought against her if she told the truth.
Then, while Officer Muhlenburg was out of the room making some additional inquiries, Haskin told Pierce that Muhlenburg would not be as nice as he was. Haskin testified what he meant by that, and explained to her, was that if Muhlenburg "was lied to, he may end up charging her . . . for the full extent. . . ." He further stated what he meant was that Muhlenburg had less tolerance for lying and he potentially could charge her with more offenses if she lied. However, Haskin testified he could not recall whether he actually used the word "potentially" when interrogating Pierce. Neither Haskin nor Muhlenburg ever told Pierce what additional charges they might be able bring against her, and the record discloses none. Instead, Haskin chose to simply inform Pierce she might be in jeopardy of having other charges brought against her unless she cooperated, "a threat, thinly veiled at best, that the filing of other charges might be the price [Pierce] would pay for not admitting [her] involvement in the [forgery]." See Rhiner, 352 N.W.2d at 263.
At about this point in the questioning Pierce again began to cry and again stated she wanted to see her children. Officer Haskin told her he had three children of his own and he would not want to be away from them any longer than he had to be either, just for not being honest, and if she told the truth she "may not be charged with anything, you may be charged for half, you may be charged with the majority." Thus, Haskin at least implied to Pierce not only that she might have more charges filed against her if she did not "tell the truth" by admitting culpability, but also that if she did admit her culpability she would be able to be with her children sooner.
At that point Pierce asked Haskin to get Muhlenburg back in the room and she would tell the truth. She then gave her second written statement, setting forth her third and final version of events, detailed above, in which she confessed to the crime by admitting knowingly passing a counterfeit one-hundred-dollar bill.
We find the following statement from Mullin applicable to Officer Haskin's statements to Pierce concerning the probability or possibility of fewer charges or no charges if she told the truth:
 [I]t seems clear these statements were such as might well raise in the mind of the accused the hope that if he made the so-called confession he would receive better treatment, less severe punishment, and more mercy than if he denied his guilt and was tried and found guilty of the offense by the jury. Statements so obtained consistently have been termed involuntary. . . .
See Hodges, 326 N.W.2d at 348 (quotingMullin, 249 Iowa at 13, 85 N.W.2d at 600).
We conclude Pierce's inculpatory statements were improperly induced, both by what Officer Haskin said to her and the surrounding circumstances under which the statements were made. We are satisfied the aforementioned not-so-subtle threats of additional charges and implied promises of leniency by Officer Haskin induced Pierce's inculpatory statements. Thus, Pierce's inculpatory statements were not freely and voluntarily given.
IV. CONCLUSION.
We conclude Pierce's inculpatory statements were induced by both the threat of additional charges and at least implied promises of leniency, made by police officers during their extended interrogation of Pierce. We conclude the State has not shown that her inculpatory statements were the product of a "rational intellect and free will." They were not freely and voluntarily given. Accordingly, we conclude the district court erred in denying Pierce's motion to suppress. Pierce is entitled to a new trial at which the State will not be allowed to use Pierce's involuntary, inculpatory statements against her.
REVERSED AND REMANDED.
[1] See United States v. Miranda, 384 U.S. 436,469-70, 86 S. Ct. 1602, 1625-26, 16 L. Ed. 2d 694, 722 (1966).