# IN THE COURT OF APPEALS OF IOWA

No. 22-0832
Filed July 26, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JERMAINE GREGORY MILLER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Jeffrey D. Bert, Judge.


        Jermaine Miller appeals his criminal convictions.  **AFFIRMED.**


        Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Olivia D. Brooks and Thomas J. Ogden, Assistant Attorneys General, for appellee.


        Heard by Ahlers, P.J., Badding, J., and Mullins, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**MULLINS, Senior Judge.**

Jermaine Miller appeals his convictions—following a bench trial—for first-degree robbery, conspiracy to commit a forcible felony, first-degree theft, going armed with intent, assault while participating in a felony, and assault while displaying a dangerous weapon. He challenges the sufficiency of the evidence supporting each conviction, argues the court erred in overruling his objection to the admission of his seized clothing as evidence, and claims the court abused its discretion in denying his motion for a new trial "on the ground that he did not receive a fair trial."

**I.      Background Facts and Proceedings**

On December 5, 2019, Adam Dugan was working alone at a Davenport Verizon cell phone store. At around 7:14 p.m., he "was robbed at gunpoint." He explained that as he was counting out the drawer, two men wearing masks came into the store. He didn't think much of the masks since it was cold out, but then he "saw the gun." The men told him to put his hands up and "cattled [him] into the back room, in which then they opened a safe door and then told [him] to lie down on the ground." As the masked duo loaded up a trash bag with merchandise, "they would double back and either put the gun to [Dugan's] back or the back of [his] head." On one occasion, one of the individuals placed the gun to the back of Dugan's head and advised the other: "This motherfucker looks like he wants to move." Dugan testified he feared for his life and thought he might be shot. After a short time, the duo exited the back door with their loot.

A series of videos that were captured by the store's interior surveillance system and admitted as evidence at trial show the following.[1]  The first video shows the interior entry of the store, through which the perpetrators entered at roughly 7:14 p.m.  One—who we will refer to as Mr. Green—was wearing a dark green hooded jacket or windbreaker with the hood up, black pants, black shoes, and what appears to be a black ski mask.  The other—Mr. Blue—donned black pants; black shoes; an unzipped black, full-zip hooded sweatshirt with the hood pulled up over a blue hooded underlayer garment, and some sort of face covering.

The second and third videos were captured by cameras behind the counter and over the showroom.  These vantage points capture Dugan's work space as well as the front door area shown in the first video.  The videos show that as Mr. Green approached the counter from the entry way, he pulled a firearm from his left pant pocket, pointed it at Dugan, and gestured him to come out from behind the counter.  Mr. Green then led the way to the back room.  Mr. Blue, with one hand on Dugan's back and the other in his pocket, led Dugan into the back room in a pushing fashion.

The final two videos show the back room.  Consistent with the other videos, Mr. Green, Mr. Blue, and Dugan entered the back room not long after 7:14 p.m.  Mr. Green immediately points the firearm at Dugan's head and gestured him to the ground.  Meanwhile, Mr. Blue opened the safe, locked the door to the room, grabbed a large black garbage bag or two, and began unloading the contents of the safe into the bags.  As Mr. Blue unloaded the safe, Mr. Green largely kept his

_____

[1] None of the videos have audio.

firearm pressed to Dugan's back. Mr. Green and Mr. Blue exited the back door of the store about a minute after they entered the back room.

Not long after they left, one of the two customers who the videos show entered the store while the safe was being unloaded knocked on the door to the back room, which prompted Dugan to get up off the floor and respond. After apparently explaining the situation to the customers, Dugan called the police. The value of the items taken from the safe totaled $22,516.70. Dispatch reported the armed robbery and identified the suspects as two black males in ski masks. Various officers were already nearby on a report of a shooting and responded to the area in short order.

After responding to the area, Officers Ryan Leabo and Murphy Simms of the Davenport Police Department were advised by dispatch that a 911 call was received from 1725 Locust Street "that a black male was walking through yards and that they thought it was suspicious." Officer Leabo testified they then observed a black male wearing a blue hooded sweatshirt, black pants, and black shoes walking eastbound in the 1800 block of Locust Street. They pulled up next to him and exited their squad car, upon which the subject "fled on foot." Officer Leabo testified the subject "ran south across Locust Street, and then, continued south in an alley to the west of Davie Street, and then, back east through a couple houses." The following image depicts where Officer Leabo recalled originally seeing the subject on the corner of Locust Street and Wilkes Avenue marked with an X, the path he took in fleeing shown by a dotted line, and where he was apprehended shown by a circled X on Davie Street. It also shows the location of the Verizon

store in the southwest corner of Locust and Division Streets, marked with a blue icon.



The fleeing subject was identified as Miller. Officer Leabo was later directed by detectives investigating the Verizon incident to collect Miller's clothing when he was booked into jail on a separate charge of interference with official acts. He did so and placed those items in evidence. Those items included a blue Nike hooded sweatshirt, a black tee shirt he wore underneath, a black pair of jeans, a black pair of pajama pants he had on under the jeans, and a black pair of boots.

Officers Nate Kelling and Kevin Remley were the first to respond to the Verizon store. Officer Kelling testified that while they were speaking with Dugan, "[a] call came in a block away to the west, there was a male walking back and forth in the alley." Officer Kelling looked in that direction to see if he could see anything, and he observed a male subject walking on the sidewalk on the north side of Locust Street. Another squad car approached that male, apparently being Officers Leabo

and Simms, upon which the subject fled southeast on foot. Officer Kelling gave chase to cut him off and was ultimately the first officer to reach the subject, Miller, after he surrendered. Miller reported to Officer Kelling that he was just in the area to buy marijuana. The following image depicts where Officer Kelling testified he thought he first observed Miller,[2] what direction he fled to, and where he was apprehended on Davie Street.



Officer Randy Hegg and his partner were a few blocks away from the store when the call went out about the robbery around 7:15 p.m. After they turned west on 17th Street from Division Street while they were canvassing the area, they "saw a black male walking out of" an alley a few blocks southwest of the store. The

---

[2] Officer Kelling could not recall specifically where Miller was located when he first saw him, and he may have been east or west of Wilkes Avenue.

following image shows the officers' course of travel, with an X showing where they saw the male coming out of the alley.



That individual was detained and identified as Lynn Brooks. A search of his person didn't turn up anything. Officer Hegg searched the alley he came out of. In the rear of the residence circled on the above image, Officer Hegg found a black pistol placed on top of a garbage can near the garage and two black garbage bags containing multiple phones that were brand new and still in their boxes.

Officer Simms, who had been riding with Office Leabo, was "flagged down" by Sara Hipsman after Miller was placed into custody. Hipsman testified she was parked in the alley west of Davie Street by her boyfriend's house. While parked, she observed "someone standing behind one of the garages further down the alley" and, since she was on "high alert" due to her knowledge of a shooting earlier that day, she decided to call it in because "it looked out of place." She testified the

person was standing and appeared to be holding a duffel bag. After she called the police, she saw a second person come around the corner and run southbound toward 17th Street. She said that person was holding something and threw it. She "assumed it was a gun," but couldn't be sure because it was dark. The person she originally saw went west toward Wilkes Avenue through a yard. The following map shows an X where Hipsman testified she was parked, a circle with a directional line showing where the first individual she saw proceeded to Wilkes Avenue, and a triangle where she initially saw the second person.



Hipsman later added that both individuals originally came down the alley from the area of Locust Street and proceeded south. Both had their hoodies up. She testified she thought the circle was a black male wearing "a gray jacket or hooded sweatshirt," and the triangle was wearing "a blue jacket, hoodie." After

Hipsman interacted with officers, she was taken near the Verizon store to potentially identify suspects, but she didn't recognize any of them.

Detective Craig Stone was assigned to investigate the robbery. He met with Miller the night of the robbery and took photographs of him. Those photographs show Miller was wearing a blue hooded sweatshirt, black jeans, and black boots. Investigator William Thomas reviewed the case and, after comparing the video evidence with the photos taken by Detective Stone, testified the person in the video was wearing the same hooded sweatshirt, shoes, and pants that Miller was when he was taken into custody.

On the morning of December 6 at roughly 9:45 a.m., Officer Robert Bytnar was dispatched in response to a call from a woman who reported she received a message from Brooks through social media requesting her to pick him up and give him a ride to the area of Locust and Wilkes. Officer Bytnar referred her to detectives and began looking around the area near the Verizon store. In the front bushes of an unoccupied home located at 1725 Davie Street, Officer Bytnar found a green jacket, a black sweatshirt, a gray long-sleeved tee shirt, a black mask, and two black stocking caps. The house at which the items were found is circled on the following map.



Ultimately, Miller was charged by trial information with (1) first-degree robbery, (2) conspiracy to commit a forcible felony, (3) first-degree theft, (4) going armed with intent, (5) dominion and control or possession of a firearm by a felon, (6) assault while participating in a felony, and (7) assault while displaying a dangerous weapon.[3]

The evidence is undisputed that Brooks was the person brandishing the gun at the Verizon store. Turning to evidence about the identity of the second participant, Miller's fingerprints were found on the garbage bags in which the phones were located. Furthermore, messages from Miller's Facebook account show he spoke with various individuals about trying to "make some bread" by

---

[3] With the exception of counts two and five, each charge pled the statutes for aiding and abetting and joint criminal conduct.

"doing phones." In one, he messaged another individual questioning: "Wya[4] tryna do these phones wit me." He messaged another individual, "trynna make some money." When asked how, Miller advised, "Phones." When the other individual advised he or she already did Sprint and AT&T, Miller stated, "Verizon then." Miller advised yet another individual: "By getting these phones for me Ima pay you and pay for the phones." He told another individual, "Ima pay you to put these phones in yo name." Miller messaged several others about trying to "make some bread" by "doing phones."

After hearing the State's evidence, Miller testified he "had just come from buying some weed" when the officers approached him on the night in question. He said the officers didn't find any drugs on him because it probably fell out of his pocket. He said he didn't know the individuals who pulled up on him were the police, and he ran because there had "been a lot of shootings going on" and he "didn't know what to expect." He noted he stopped running and surrendered after one of them cut him off and he realized he was a police officer. He also explained when he was walking through the alley between Wilkes and Davie on his way to buy marijuana, he saw "a guy, he sits a bag down, and he cuts through the house, like in between the house, like he was looking for something." Miller said he looked through this black trash bag that contained boxes, decided to leave it there, and then "continued walking on [his] way." Miller denied being in the Verizon store with Brooks. As to his Facebook messages, Miller explained:

---

4 "WYA is an acronym that means where you at, and it is used mostly in texting and social media." *WYA*, Dictionary.com, https://www.dictionary.com/e/acronyms/wya/ (last visited July 21, 2023).

> So pretty much, I was messaging people to see if they would put a phone in their name. I told them I would pretty much pay them and pay for the phones. I never said anything about, like stealing the phones. All they had to do is pretty much get approved, like credit-wise. I don't have good credit, so I was trying to get them to use their credit I guess.
>
> . . . .
>
> It would be my phone, because I'm technically, paying them for the phone, and I'm paying them for getting the phone. I'm paying for the phone, too, so it would be my phone. It would just be in their name.

During Miller's testimony, the State admitted a certified record of Miller's prior conviction for armed robbery in Illinois in February 2019, which also involved robbing an employee of a Verizon store of currency and various cell phones.

Following a bench trial, the court found Miller guilty as charged on all counts except possession of a firearm by a felon. The court specifically found Miller's explanation for his prints being on the garbage bags not credible and essentially determined the only reasonable conclusion that could be drawn from the evidence was that Miller and Mr. Blue were the same person. The court explained the clothes Miller was wearing in the photos taken at the police station in comparison to the clothes worn by Mr. Blue in the videos and the still photo taken therefrom shared "undeniable similarities," namely the identical shoes and "the way the jeans hug Miller's body." The court also highlighted the quick response by the police, Miller's vicinity in the area, his flight, and the absence of others in the area, except Brooks. The court also found Miller's "prior conviction to be probative for purposes of impeachment as well as to show identity and opportunity." Lastly, the court noted Miller's Facebook messages served as circumstantial evidence of his involvement.

Miller filed a motion for a new trial, claiming, among other things, he did not receive a fair trial due to (1) testimony from Hipsman that was beyond the minutes of evidence and (2) the admission of "evidence illegally obtained by the State," namely his clothing. The motion was heard at the time of sentencing, at which point Miller raised an additional claim concerning purported newly discovered evidence—Brooks's supposed statement to law enforcement that he was with someone else during the robbery. Defense counsel essentially conceded the complaint about the seizure of clothing should have been raised in a pre-trial motion to suppress. The State responded any error was harmless because the clothes were depicted in other photographic evidence. The State added Hipsman's testimony was consistent with the minutes of evidence. Agreeing with the State, the court denied the new-trial motion. At sentencing, the court merged Miller's conviction for conspiracy with his conviction for robbery. On the robbery conviction, the court sentenced Miller to twenty-five years in prison with a mandatory minimum of fifty percent and ordered the prison sentences on all other counts to run concurrently.

Miller appeals.

## II.  Analysis

### A.  Admission of Clothing

Before delving into Miller's challenges to the sufficiency of evidence, we first address his claim that "the district court erred in overruling [his] objection to his illegally seized clothing." During trial, the State requested to admit the clothing Miller was wearing when he was booked into jail. The defense objected for the following reasons: (1) "the only way he fit the description at that time was a black

male," (2) there was no probable cause to arrest him at that time for interference because he may not have known the contacting officers were the police, and (3) he had not yet been charged with the robbery. The court overruled the objection. In his motion for a new trial, he argued "[t]he officers did not have probable cause or authority to seize his clothing." On appeal, Miller only claims his clothes were illegally seized without probable cause.

Miller seems to acknowledge this claim should have been raised by a pre-trial motion to suppress. *See* Iowa R. Crim. P. 2.11(2)(c); *State v. Ortega*, No. 19-1948, 2021 WL 1907132, at *3 (Iowa Ct. App. May 12, 2021) (noting challenges to admission of evidence based on illegal seizure "must be made by pretrial motion to suppress"). While Miller hints at good cause for raising the issue late, *see* Iowa R. Crim. P. 2.11(3), that issue was not litigated below and is therefore waived and not preserved. *See State v. Hrbek*, 336 N.W.2d 431, 435 (Iowa 1983) (finding failure to "allege or establish good cause for having failed to" file a motion to suppress amounts to waiver of the objection). To the extent Miller argues his counsel was ineffective on this front, he also seems to acknowledge such a claim must be brought in a postconviction-relief proceeding and cannot be considered on direct appeal. *See* Iowa Code § 814.7 (2020).

In any event, even alleged constitutional error does not entitle Miller to relief if we are "able to declare it harmless beyond a reasonable doubt." *State v. Gibbs*, 941 N.W.2d 888, 900 (Iowa 2020) (citation omitted). Here, we declare that to be the case. The evidence was merely cumulative of basically identical evidence that was actually even more probative than Miller's physical clothes. *See State v. Newell*, 710 N.W.2d 6, 27 (Iowa 2006) (finding harmless error based on

cumulative evidence). Specifically, photographs of Miller actually wearing the identifying clothing were admitted as evidence, without objection. They showed how the clothing fit Miller in comparison to how the clothing fit Mr. Blue in the video evidence and still photo taken therefrom. As the district court later stated in ruling on Miller's motion for a new trial, the physical clothes themselves were insignificant.

Finding this issue should have been raised by a motion to suppress, the issue of good cause for the late filing was waived and not preserved, and the alleged error was harmless beyond a reasonable doubt, we affirm on this point.

### B. Sufficiency of Evidence

Miller challenges the sufficiency of the evidence supporting his convictions on all counts. We review challenges to the sufficiency of evidence for errors at law, giving deference to the verdict, which binds us if it is supported by substantial evidence. *State v. Cahill*, 972 N.W.2d 19, 27 (Iowa 2022). We view "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)). All evidence is considered, not just that of an inculpatory nature. *See Huser*, 894 N.W.2d at 490. A verdict will be upheld if substantial evidence supports it. *State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018). "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational [factfinder] that the defendant is guilty beyond a reasonable doubt.'" *Id.* (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)). Evidence is not rendered insubstantial merely because it might support a different conclusion; the only

question is whether the evidence supports the finding actually made. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021).

### 1. *Error preservation*

Before addressing Miller's specific challenges to the sufficiency of the evidence, we first address a claim he makes within this overarching argument, specifically that "the district court considered [his] prior conviction for an improper purpose." Miller agrees he did not object to the admission of his prior conviction at trial, and our review of the record discloses he did not raise the claim he is raising on appeal in the district court—that the court considered it "as evidence of identity and opportunity" rather than solely for impeachment—either in his motion for new trial or otherwise. For these reasons, the State submits Miller has failed to preserve error. Miller responds in his reply brief that "no further error preservation was required," but he does not meaningfully explain why. At oral argument, Miller essentially took the position that the district court was required to analyze the evidence on its own motion, despite the lack of an objection, and determine for what purpose it could be considered. We side with the State for the following reasons.

First of all, we acknowledge defendants need not preserve error on sufficiency-of-evidence challenges. *See State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). But just because Miller labels his claim as one of the sufficiency of the evidence does not mean that's what it is. *See Lee v. State*, 815 N.W.2d 731, 739 (Iowa 2012) (noting "[w]e will not exalt form over substance" when considering error preservation). Rather, the issue concerns a question of the permissible use of the evidence as prior bad acts under Iowa Rule of Evidence

5.404(b), which is an issue that must be preserved. *See State v. Mulvany*, 603 N.W.2d 630, 633 (Iowa Ct . App. 1999); *see also* Iowa R. Evid. 5.103(a)(1) (noting a party may only claim evidentiary error upon a timely objection or motion to strike accompanied by the specific ground for the objection or motion). While Miller requested exclusion of 5.404(b) evidence in his pre-trial motion in limine, the court never explicitly entered a ruling on the paragraph of the motion that addressed such evidence. Even if that paragraph had been granted, Miller basically agreed to admission of the prior conviction and offered no reservations about it at trial. *See State v. Hales*, No. 19-2028, 2021 WL 211128, at *3 (Iowa Ct. App. Jan 21. 2021) ("[A] stipulation to the admission of [evidence] at trial constitutes a waiver of any objection to the [evidence] raised prior to trial.").

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we decide them on appeal," and "[w]e will not consider an evidentiary complaint unless the complaining party made their 'specific objection' to the evidence 'known' in the district court, and the court had the 'opportunity to pass upon the objection and correct any error.'" *State v. Trane*, 948 N.W.2d 429, 434–35 (Iowa 2023) (citations omitted). Here, Miller did not object to the evidence, and he did not raise a complaint after the court noted in its verdict that it found the evidence probative on identity and opportunity. As a result, the court did not have an opportunity to correct the alleged error, so neither will we. *See State v. Hanes*, 981 N.W.2d 454, 460 (Iowa 2022) (noting appellate courts are courts "of review, not of first view" (citation omitted)).

### 2.    Identity

Generally, as to all counts, Miller argues the evidence was insufficient to show he was one of the individuals who participated in the crimes.  He points out that the only recovered ski mask had Brooks's DNA, he was wearing "standard attire" when arrested, the black coat did not contain his DNA, no witness identified him, he ran toward the scene of the crime, his fingerprints were not located at the scene, he explained why his prints were on the garbage bags and why phones would be of no value to him, and no connection was established between him and Brooks.

It's true that this was a case of circumstantial evidence.  But "circumstantial evidence is as probative as direct evidence."  *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022).  And, here, there was a lot of it.  Specifically, in the days leading up to the crimes, Miller talked to several individuals about making money doing phones.  One of those messages noted the scheme would be done at Verizon, where the robbery took place.  Miller was apprehended in the area just minutes after the robbery, after he fled from police, wearing clothes matching the individual in the videos, save the dark jacket that was found discarded nearby and a face covering.  While Miller maintained he did not know he was running from police, we give due deference to the district court's finding that his explanations lacked credibility.  *See State v. Wilde*, 987 N.W.2d 486, 491 (Iowa Ct. App. 2022).  He only surrendered after he was cut off by another officer coming from the direction he was heading.  And while Miller ran somewhat toward the Verizon store, he seemed to acknowledge in his testimony he didn't know his way around the area very well.

Comparing the videos and still photos with the photographs of Miller at the jail, one could reasonably conclude the shoes and pants were identical. The blue hoodie Miller was wearing at jail was also strikingly similar to the portions of the hoodie that can be seen in the videos. Of particular note, it's the exact same color. Even more compelling, when Mr. Blue walked into the store, the draw strings of his hoodie can be observed in the video to swing out from under his top jacket, with the left string being longer than the right. That circumstance is also present in the photo of Miller at the jail. And the similarities between Miller's build and physique when compared to Mr. Blue are undeniable. Finally, Miller's fingerprints were found on the garbage bags in which the looted inventory was found and, again, we defer to the district court's rejection of Miller's explanation for that. *See id.*

On our review, we find the State provided substantial evidence that Miller and Mr. Blue are indeed the same person and, therefore, his identity was established beyond a reasonable doubt.[5]

### 3. First-degree robbery

As to robbery specifically, Miller argues "the State failed to demonstrate that [he] had knowledge of a dangerous weapon," so he cannot be guilty under an aider-and-abettor theory. As the State points out, "in the context of a first-degree robbery prosecution under the dangerous weapon alternative, the State must prove the alleged aider and abettor had knowledge that a dangerous weapon

---

[5] As to first-degree theft and assault while participating in a felony, Miller only challenges the sufficiency of evidence supporting identity, so we need not address those convictions separately below.

would be *or was being used.*" *State v. Henderson*, 908 N.W.2d 868, 876 (Iowa 2018). The evidence is sufficient to show Miller, at the very least, knew a dangerous weapon was being used. Brooks pulled it out as soon as they entered the store and waved it around, and the masked duo continued the robbery. We affirm the robbery conviction.

### 4. Conspiracy to commit a forcible felony

Turning to conspiracy, Miller repeats his identity claim and additionally argues there was "no evidence of any agreement or communication between [him] and Brooks." Given that the conspiracy conviction merged with the robbery conviction and we have already found the evidence to support the latter conviction sufficient, this challenge is moot. *See State v. LuCore*, 989 N.W.2d 209, 219 (Iowa Ct. App. 2023). In any event, given how the crime was quickly executed as shown in the videos, we find the evidence sufficient to show Miller and Brooks agreed to engage in the conduct constituting the crime and Miller agreed to aid in the planning and commission of the crime. *See* Iowa Code § 706.1(1).

### 5. Going armed with intent

As to going armed with intent, Miller argues "there was no evidence that [he] was aware that Brooks possessed a firearm" or "of an intent [by Brooks] to actually use or shoot the firearm." Under the aider-and-abettor theory, the State had to prove that Miller "either shared the requisite specific intent or knew of [Brooks's] mental state before or at the time the offense was committed." *State v. Pearson*, 547 N.W.2d 236, 241 (Iowa Ct. App. 1996). And "the 'intent to use' element requires proof of an intent to shoot another person when a firearm is involved." *State v. Slayton*, 417 N.W.2d 432, 434 (Iowa 1987).

As noted above, the evidence is sufficient to show Miller knew Brooks possessed a firearm at the time of the crimes. So we turn to whether he shared or had knowledge of the requisite intent on the part of Brooks. Specific "intent is seldom capable of direct proof, but may be shown by reasonable inferences drawn from the facts established." *See State v. Chatterson*, 259 N.W.2d 766, 769–70 (Iowa 1977). The only limitation on inferences provided by section 707.8 is that the requisite intent "shall not be inferred from the mere carrying or concealment of any dangerous weapon itself, including the carrying of a loaded firearm." But here, Brooks did much more, and the evidence shows it was part of he and Miller's calculated plan of attack. Specifically, Brooks pointed the gun at Dugan immediately upon walking into the store. Following that lead, Miller "cattled" Dugan into the back room, advising: "Go. Go. Get in the back room. Don't mess around." Once there, Brooks held the gun on Dugan while Miller collected the merchandise, during which Brooks advised: "This motherfucker looks like he wants to move." Viewing the video, a reasonable conclusion is that this was all according to the plan. And we know the firearm had one round in the chamber and four in the magazine.

In *Slayton*, the defendant simply "grabbed a shotgun and a single shotgun shell from the garage and entered his parents' bedroom while they were sleeping." 417 N.W.2d at 433. The supreme court first noted the statute requires an intent to discharge a firearm at another person as opposed to merely using it to frighten, intimidate, or harass another with no intent to discharge. *Id.* at 434–35. Viewing the evidence in the light most favorable to the State, the court found the evidence sufficient to support the intent element. *Id.* at 435. The court explained the

defendant, before his father subdued him, pointed the shotgun at his parents and chased after his mother while placing a shell in the gun. *Id.* In the supreme court's view, "[a] reasonable jury could infer from this evidence that defendant intended to use the shotgun against his parents by shooting them." *Id.*

In *Slayton*, it could be assumed the defendant would have discharged the firearm on another if his father had not subdued him. Here, we are dealing with somewhat of an inverse situation, with a condition precedent—Dugan's lack of compliance, as signaled by Brooks's insinuation that he shouldn't move while Brooks was holding the gun to him—triggering the actual discharge of the firearm at Dugan. And the video evidence does not indicate Miller was phased by that implied course of action during the window of time that Brooks would have said it, when Dugan was face down with a gun to his back and head.

Viewing the evidence in the light most favorable to the State, as we must, on this evidence we find a rational factfinder could reasonably conclude that Brooks intended to use the firearm and Miller either shared that intent or knew of Brooks's intent before or at the time of the offense. While we acknowledge that merely using a firearm to frighten, intimidate, or harass another with no intent to discharge is insufficient to establish the intent-to-use element, the evidence here, when viewed in the light most favorable to the State, showed more than mere intent to frighten, intimidate, or harass. Rather, it showed an intent to use if Dugan did not comply. And the evidence shows Miller knew of Brooks's mental state in that regard at the time the offense was committed, at the very least. As such, we find the evidence sufficient to support the conviction under an aider-and-abettor theory.

### 6. Assault while displaying a dangerous weapon

As to this conviction, Miller argues "there was no evidence that [he] did anything to aid or abet [Brooks's] possession of a gun." We summarily agree with the State that it "offered substantial evidence that Miller knew of the assault and encouraged it by continuing to do his part of the armed robbery." As such, we reject Miller's challenge to this conviction.

### C. Motion for New Trial

Lastly, Miller challenges the denial of his motion for a new trial. We reject his claim as to the seizure of his clothing for the same reasons noted above. Specifically, the district court found—even if it were to ignore the fact that the issue should have been raised by a pre-trial motion to suppress—the physical clothing had little to no "significance in terms of the decision." We agree.

For his claim about "newly discovered evidence that included codefendant Brooks making a statement to a police officer that he was with someone other than Miller," that claim was not actually raised in Miller's written motion for a new trial. Defense counsel did raise this issue at the hearing on the motion, however, noting Miller advised him "right before this hearing" that "[i]n discovery" it was learned that Brooks told a police officer that he was with another individual during the night in question. The State responded Brooks was probably lying if he made that statement, and it was aware "of at least two subsequent statements that Mr. Brooks made directly implicating Mr. Miller." On appeal, Miller only argues "[t]his relevant, exculpatory information only became known to [him] and his counsel just prior to the sentencing hearing." But he does not specifically argue how it entitles him to a new trial. In any event, the record indicates this supposed statement by

Brooks was disclosed during discovery, so it cannot be said Miller was not "aware of the evidence prior to the verdict." *See State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020). While counsel argued at the hearing that Miller would not have been unable to present this evidence because Brooks was a codefendant awaiting trial, the record does not disclose that he made any "affirmative attempt to . . . offer the evidence into the record." *Id.* Furthermore, a movant for a new trial based on allegedly new evidence must also show "that such evidence will probably change the result if a new trial is granted." *State v. Compiano*, 154 N.W.2d 845, 850 (Iowa 1967). We conclude Miller failed to make that showing, so we affirm the denial of the motion for a new trial on this point.

That leaves us with Miller's claim that Hipsman's testimony went beyond the minutes of evidence. He submits the minutes of evidence "state that Hipsman saw a single 'black male wearing a gray jacket or hooded sweatshirt near the middle of the alley' who then ran west" and she "'observed Miller running through the alley being chased' by officers approximately three minutes later." Turning to Hipsman's trial testimony, he complains she additionally "testified that she actually saw the individual hold a bag and later throwing an object, which may have been a gun."

First, we agree that because Miller did not object to Hipsman's testimony at trial, his challenge thereof in his motion for a new trial was too late to preserve error. *See State v. Droste*, 232 N.W.2d 483, 488 (Iowa 1975) (finding claim raised on appeal did "not serve to preserve for review in this court the issue presented" because "[t]he grounds of a motion for new trial must stand or fall on exceptions taken at trial and a party cannot in a post verdict motion amplify or add new

grounds as a basis for relief"). Either way, while it is true the minutes of evidence did not disclose every detail that Hipsman testified to at trial, "there is no requirement that the minutes . . . provide a complete catalogue of witness testimony at trial, but only that the defense be placed on fair notice and not subject to surprise testimony." *State v. Shorter*, 893 N.W.2d 65, 81 (Iowa 2017). The minutes at least poised Hipsman as a witness located in a critical area, which placed the defense "on notice of the necessity of further investigation of the witness'[s] probable testimony." *Id.* (alteration in original) (citation omitted). Miller acknowledges he did not conduct depositions. To the extent he faults counsel for that, his remedy, if any, is by postconviction relief. We affirm the denial of Miller's motion for a new trial on this ground as well.

## III.   Conclusion

We affirm Miller's convictions.

**AFFIRMED.**